REINHARDT, Circuit Judge:
Appellants American Coupon Exchange (“ACE”) and ACE’s principal, Neil Weis-man,[1] appeal from a permanent injunction prohibiting them from brokering “frequent flyer” coupons awarded by TransWorld Airlines, Inc. (“TWA”). In connection with that appeal, ACE also asks us to reverse the district court’s entry of summary judgment in favor of TWA on several other matters: first, the airline’s claim for tor-tious interference with business relations and its request for a judicial declaration that the restrictions it imposes on the transferability of its frequent flyer coupons are not contrary to public policy, and second, ACE’s counterclaims for similar relief. Although we agree with the district court’s conclusion that the transfer restrictions do not violate the public policy relied upon by ACE, and therefore with its order granting TWA’s request for declaratory relief, we nonetheless conclude that the district court erred in granting TWA’s motion for summary judgment on the tort claim, and in entering a permanent injunction based on the commission of that tort and on the existence of attendant damages not susceptible to ready calculation. We therefore vacate the permanent injunction and the summary judgment for TWA on its tort claim. We also affirm the declaratory judgment for TWA, as well as the summary judgment in its favor on the counterclaims alleged by ACE and Weisman. Finally, we remand this case to the district court for further proceedings in accordance with this opinion.
I
STATEMENT OF THE CASE
This case presents a number of difficult legal issues arising from the operation of “frequent flyer” programs, incentive sys-terns devised by the airline industry to encourage potential passengers to book passage repeatedly on a particular airline instead of choosing a different airline for each flight. Under these programs, passengers generally receive credit of some sort for miles flown on the airline in question, and sometimes receive additional credit for bestowing their patronage upon allied airlines, hotels, and car rental agencies. By redeeming specified amounts of this “mileage” credit, passengers can receive coupons good for free or reduced-fare air travel or other services from the airline and its allies.
TWA, one of this country’s largest airlines, instituted its Frequent Flyer Bonus Program in 1982. The rules and regulations specifying the manner in which passengers may earn frequent flyer awards are published and filed as tariffs with the Department of Transportation pursuant to 14 C.F.R. § 221.3. Under these tariffs, a program member who has accumulated the requisite amount of mileage credit may receive his award by making a written request to TWA and advising it of the name of the person in whose name the award certificate is to be issued; the airline then issues the award in the designee’s name.
At the inception of the program, TWA’s tariffs allowed a member to designate any person of his choice to use an award earned by the member. However, the airline amended its tariffs in November and December of 1983, requiring that the travel awards be issued in the name of the member, prohibiting their transfer, and reserving the right to disqualify members who violated this or any other rule of the frequent flyer program. Finally, in February of 1986, TWA again amended its tariffs, this time easing the effect of its transfer prohibition by allowing a member to “designate a family member, legal dependant or relative to use the award in his place.” [2] The amended tariffs stated that any certificate issued to anyone other than a family *679 member, legal dependent, or relative would be void, as would any certificate deemed by TWA to have been sold or bartered.
Because the most frequent of flyers may accumulate enough mileage credit for many, many awards, it is perhaps unsurprising that a secondary market for frequent flyer coupons has emerged in recent years. ACE, a California corporation of which Weisman is both President and sole shareholder, acts as a broker in this market.[3] Since June of 1983 ACE has offered, primarily through advertisements in travel magazines, to buy frequent flyer coupons issued by many major airlines, including TWA. ACE then sells these coupons to other travellers at a price estimated to be from thirty to seventy percent of the cost of a full-fare ticket. The travellers who buy these coupons may then present them to airlines or travel agents for the issuance of a ticket. ACE instructs each person to whom it sells a TWA Frequent Flyer Bonus Program award to refrain from telling the airline where he bought his ticket, and to pretend to be a relative of the program member from whom the award was purchased.
TWA has been aware of this secondary market since 1983. The parties hotly dispute the airline’s stance toward coupon brokers since then. ACE alleges that although TWA did not publicly condone or support coupon brokering, TWA accepted it as “a fact of life” and frequently “looked the other way” with its most valued customers by allowing them to sell their certificates or by willingly issuing certificates to spurious “relatives” of these favored patrons. According to ACE, TWA even sought to profit from the secondary market by raising certain handling charges applicable primarily to brokers. TWA claims that it undertook a “measured response” to coupon brokering, attempting to discourage the practice “informally.” However one characterizes TWA’s response during the first three or four years of ACE’s operation, there is no doubt that TWA eventually escalated its antibrokering efforts, by refusing to honor tickets purchased with brokered award coupons and ceasing to deal with ticket agents who accepted brokered coupons.
Apparently unsatisfied with the results of its earlier efforts, TWA ultimately decided to file a complaint against ACE and Weisman in the district court, invoking diversity jurisdiction, 28 U.S.C. § 1332. TWA’s complaint alleged the intentional torts of fraud and interference with business relations, and requested declaratory and injunctive relief as well as damages. ACE’s answer asserted a number of affirmative defenses, including waiver, estop-pel, laches, unclean hands, and privilege. ACE also asserted that the injunction requested by TWA would further an illegal scheme in violation of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2. Most of ACE’s other defenses generally aver, in a remarkable variety of ways, that TWA’s tariffs are unenforceable because they are unreasonable restrictions upon the transfer of “travel rights” and are therefore contrary to the public policy against restraints on alienation of property. ACE also counterclaimed against TWA, alleging interference with business relations and violation of sections 1 and 2 of the Sherman Act. ACE sought declaratory and injunc-tive relief as well as damages, and demanded a jury trial.
Prior to the motion that led to this appeal, the district court denied TWA’s motion for a preliminary injunction and denied a motion for summary judgment filed by ACE. TWA then moved for summary judgment on both the complaint and the counterclaims, and the district court granted the motion in a written opinion. Trans-World, Airlines, Inc. v. American Coupon Exchange, Inc., 682 F.Supp. 1476 (C.D.Cal.1988). The court entered a permanent in *680 junction against ACE and Weisman as requested by TWA, 682 F.Supp. at 1484, but stayed all injunctive relief pending appeal, 682 F.Supp. at 1489. The court retained jurisdiction over the case so that the amount of damages could be litigated, 682 F.Supp. at 1483,[4] but certified the controlling issues for interlocutory appeal pursuant to 28 U.S.C. § 1292(b), 682 F.Supp. at 1489.
ACE petitioned this court for permission to appeal the district court’s interlocutory order under section 1292(b), and also filed a notice of appeal. ACE’s petition for permissive interlocutory appeal was denied. We now consider the issues raised by the notice of appeal.
II
JURISDICTION
We determine questions relating to our jurisdiction at the outset. Because the district court retained jurisdiction to determine damages in this case (as well as because it retained jurisdiction over the fraud claim), its decision is not a “final decision” within the meaning of 28 U.S.C. § 1291, even though a permanent injunction was entered. Marathon Oil Co. v. United States, 807 F.2d 759, 763-64 (9th Cir.1986), cert. denied, 480 U.S. 940, 107 S.Ct. 1593, 94 L.Ed.2d 782 (1987). Nor do we have jurisdiction under section 1292(b) over the matters certified by the district court, since ACE’s petition for a permissive interlocutory appeal under this section was denied. Our jurisdiction over this appeal derives rather from section 1292(a)(1), providing for the appeal of interlocutory orders granting or refusing to grant injunctions. Because our jurisdiction under section 1292(a)(1) extends to all matters “inextricably bound up” with the order from which appeal is taken, including the merits of the case, Marathon Oil, 807 F.2d at 764, we must determine the relevance of the district court’s various rulings to the injunctive relief requested by the parties in this case.
First, it seems clear that the propriety of the summary judgment on TWA’s complaint for tortious interference with business relations is properly before us on appeal, because the permanent injunction is based on the court’s determination that the airline suffered damage as a result of conduct on ACE’s part it deemed to be tor-tious. Second, because the injunctive relief granted by the court here was permanent rather than merely preliminary, it seems equally clear that the district court’s rejection of ACE’s affirmative defenses on the merits was a necessary predicate to the entry of the injunction. We therefore have jurisdiction over those matters. Third, we have jurisdiction to review the district court's determination of TWA’s claim for declaratory relief; virtually every other issue in the case depends in some measure upon whether or not TWA is entitled to enforce its tariffs restricting transferability. Of all the issues, this one is perhaps the most “inextricably bound up” of all.
Our jurisdiction over at least some of ACE’s counterclaims is likewise clear. Counts I and II of ACE’s counterclaim allege violations of sections 1 and 2 of the Sherman Act and pray for injunctive relief. As we have noted, section 1292(a)(1) applies to appeals from orders denying as well as granting injunctions; because the order granting summary judgment for TWA on Counts I and II of the counterclaim operated as a denial of ACE’s prayer for injunc-tive relief, see Gardner v. Westinghouse Broadcasting Co., 437 U.S. 478, 481, 98 S.Ct. 2451, 2453-54, 57 L.Ed.2d 364 (1978), the district court’s rulings on these counts are appealable. General Electric Co. v. Marvel Rare Metals Co., 287 U.S. 430, 432-33, 53 S.Ct. 202, 203-04, 77 L.Ed. 408 (1932); see also California v. Kleppe, 604 F.2d 1187 (9th Cir.1979). Count III was a request for a declaratory judgment to the effect that TWA’s tariffs prohibiting transfer of award coupons are invalid and unenforceable. The judgment requested by ACE presents little more than the reverse *681 image of the judgment requested by TWA, and the district court necessarily decided on both when it decided on one. Hence, Count III of the counterclaim is appealable for the same reasons that the TWA’s fourth claim for relief is appealable.
Our jurisdiction over Count IV of the counterclaim is more problematic. Count IV alleged that TWA was tortiously interfering with ACE’s business relations, and requested only damages, costs, and attorneys’ fees. Thus, the district court’s order granting TWA summary judgment on this count does not, strictly speaking, constitute a denial of injunctive relief. Nor, at first glance, does the district court’s decision to enjoin ACE and Weisman from continuing to broker frequent flyer coupons appear to depend at all upon any particular conclusion about the merits of ACE’s own counterclaim for tortious misconduct. However, an inspection of the district court’s opinion reveals that the district court ruled against ACE on Count IV of its counterclaim for reasons which were identical to its reasons for ruling against ACE on TWA’s complaint. ACE’s allegation of tor-tious interference with business relations was found meritless because TWA was privileged to enforce its tariffs. Because ACE’s counterclaim virtually repeats the allegations of TWA’s complaint, except for offering opposite legal conclusions, and closely follows ACE’s own affirmative defenses to that complaint, we conclude that the order of summary judgment on Count IV of the counterclaim was “inextricably bound up” with the order of summary judgment on TWA’s complaint. This conclusion furthers section 1292(a)(l)’s “long-established policy against piecemeal appeals.” Gardner, 437 U.S. at 480, 98 S.Ct. at 2453. Thus, we properly proceed to consider not only the district court’s rulings on TWA’s complaint and ACE’s affirmative defenses, but also the summary judgment in favor of TWA on ACE’s counterclaims.
Ill
TWA’s REQUEST FOR DECLARATORY RELIEF
Most of the shouting in this case is about the enforceability of TWA’s tariffs restricting the transfer of frequent flyer awards. Both TWA, in its fourth claim for relief, and ACE, in Count III of its counterclaim, request judicial declarations regarding the transferability of these awards; the validity of the tariffs is also relevant, although in less direct ways, to the secondary issues under consideration in this appeal. We therefore attend first to the transferability question, which, as the district court observed, lies “at the core” of each of the motions it considered, 682 F.Supp. at 1480.
As a preliminary matter, we note that we find no reason to believe that the deregulation of the airline industry had any effect on the legal force of duly filed airline tariffs. Federal regulations prohibit carriers from making contracts inconsistent with their validly published tariffs, 14 C.F.R. § 221.3(b), and state laws “relating to rates, routes, or services of any air carrier” are expressly preempted by federal regulations and the tariffs to which they give effect. 49 U.S.C.App. § 1305(a)(1); see also Hingson v. Pacific Southwest Airlines, 743 F.2d 1408 (9th Cir.1984). Thus, while properly filed tariffs do define the terms of the subsequent contract between airlines and their passengers, they also set forth terms which may not be altered by either party; even after deregulation, “a tariff, required by law to be filed, is not a mere contract. It is the law.” Carter v. American Telephone & Telegraph Co., 365 F.2d 486, 496 (5th Cir.1966), cert. denied, 385 U.S. 1008, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967); see also United States v. Edwards, 602 F.2d 458, 462 n. 2 (1st Cir.1979).
Deregulation did, however, affect the way in which the validity of a tariff is determined. During the reign of the Civil Aeronautics Board, the CAB had jurisdiction to determine, either upon complaint or upon its own initiative, whether the tariffs filed by a carrier were unreasonable, unjustly discriminatory, or in any other way inconsistent with federal statutes and regulations. First Pennsylvania Bank v. Eastern Airlines, Inc., 731 F.2d 1113, 1120 (3d Cir.1984). When the airline industry *682 was deregulated, however, the CAB was abolished. “The courts were thus left free to proceed without circuity” in scrutinizing tariffs according to federal common-law principles. See First Pennsylvania Bank, 731 F.2d at 1120.
In asking the court to invalidate the tariffs at issue here, ACE urges that TWA’s restrictions on transfer violate public policy. In doing so, it relies exclusively on the argument that the transfer restrictions run afoul of the time-honored rule against unreasonable restraints on the alienation of property. TWA responds, first, that frequent flyer award coupons are not “property” to which the policy in favor of free alienation applies; and second, that even if the public policy advanced by ACE is applicable, the tariffs are not unreasonable restraints, and must therefore survive scrutiny. Because the district court based its decision upon the second ground, we address that question first.
A. The Reasonableness of the Restraints
The district court appeared to assume that the policy against restraints on alienation of property was applicable to frequent flyer coupons, and proceeded to analyze the reasonableness of TWA’s tariffs. Finding the restraints reasonable, the court declared that the tariffs are valid, and “conclusively govern the rights and liabilities of the parties.” 682 F.Supp. at 1481. The district court apparently regarded this purely as a question of law, and the parties agreed that it should be treated as such. We do not believe, however, that the validity of the tariffs can or should be so treated.
In support of its decision to treat the validity of the tariffs as a purely legal question, the district court cited Klicker v. Northwest Airlines, Inc., 563 F.2d 1310 (9th Cir.1977). In Klicker we did say that “the question whether a tariff is against public policy is ultimately a judicial question requiring the application of federal law.” Id. at 1313. However, we said so only to refute the argument that the federal courts were bound by the decision of the Civil Aeronautics Board under the doctrine of “primary jurisdiction.” That rule was abolished when the CAB was abolished, First Pennsylvania Bank, 731 F.2d at 1120, but the sound rationale that underlay the rule so long as it existed demonstrates why the district court’s legal conclusion of reasonableness can be upheld only if it proceeded from specific factual determinations reached after the development of an adequate evidentiary record.
The cases cited for the above quotation from Klicker demonstrate that questions involving the reasonableness of a common carrier’s tariffs almost always require substantial investigation of facts that are often complex. For instance, in Great Northern Railway Company v. Merchants Elevator Company, 259 U.S. 285, 42 S.Ct. 477, 66 L.Ed. 943 (1922), Justice Brandéis explained for a unanimous Court why it is sometimes inappropriate for courts to rule on questions that have not yet been presented to administrative agencies:
Whenever a rate, rule or practice is attacked as unreasonable or as unjustly discriminatory, ... the enquiry is essentially one of fact and of discretion in technical matters.... Moreover, that determination is reached ordinarily upon voluminous and conflicting evidence, for the adequate appreciation of which acquaintance with many intricate facts of transportation is indispensable.
259 U.S. at 291, 42 S.Ct. at 479. Thus, characterizing the ultimate question as one of law cannot eliminate the need for a full development of the factual record. The Court made this clear in another “primary jurisdiction” case more than twenty-five years later. In Southwestern Sugar and Molasses Co. v. River Terminals Corp., 360 U.S. 411, 79 S.Ct. 1210, 3 L.Ed.2d 1334 (1959), Southwestern had chartered a barge that had been towed and docked by a tug operated by the defendant, RTC. Southwestern sued RTC for damages, alleging that the barge and its cargo had been lost due to RTC’s negligence. RTC appealed from a judgment in Southwestern’s favor, urging that certain tariffs filed with the Interstate Commerce Commission operated to release RTC from all liability, and that *683 the district court had erred in judging them invalid as a matter of law. Justice Harlan explained why a purely legal determination of the tariffs’ validity was inappropriate:
For all we know, it may be that the rate specified in the relevant tariff is computed on the understanding that the exculpatory clause shall apply to relieve the towboat owner of the expense of insuring itself against liability for damage caused tows by the negligence of its servants, and is a reasonable rate so computed. If that were so, it might be hard to say that public policy demands that the tow should at once have the benefit of a rate so computed and be able to repudiate the correlative obligation of procuring its own insurance with knowledge that the towboat may be required to respond in damages for any injury caused by its negligence despite agreement to the contrary.
******
We may assume that the question whether a clause of this kind offends against public policy is one appropriate ultimately for judicial rather than administrative resolution. But that does not mean that the courts must therefore deny themselves the enlightenment which may be had from a consideration of the relevant economic and other facts....
... “Cases are not decided, nor the law appropriately understood, apart from an informed and particularized insight into the factual circumstances of the controversy under litigation.” ... This principle has particular force when the courts are asked to strike down on grounds of public policy a contractual arrangement on its face consensual.
360 U.S. at 417-18, 79 S.Ct. at 1214-15 (quoting Federal Maritime Board v. Isbrandtsen Co., 356 U.S. 481, 498, 78 S.Ct. 851, 861-62, 2 L.Ed.2d 926 (1958) (opinion of the Court by Brennan, J.)). Some of our most eminent jurists have thus spoken at some length about the importance of developing a thorough evidentiary record before evaluating a particular measure’s reasonableness in light of public policy. We find their reasoning persuasive, and we bear in mind their sound advice in evaluating the factual record before us.
In this case, we conclude that the record is wholly inadequate, and the district court’s own opinion is the most persuasive testimony to that inadequacy. In discussing the reasonableness of TWA’s tariffs, the court engaged in rather broad speculation on several crucial issues that it perceived (correctly, no doubt) to be important:
... TWA’s [Frequent Flyer Bonus (“FFB”)] Program is structured to balance the benefit of receiving additional publicity and customer loyalty with the cost of providing travel awards. Had TWA intended its FFB awards to be redeemable for cash, it might have scaled its mileage redemption rates differently, or precluded assignability of these awards entirely in an effort to reach a different balance. Accordingly, the non-transferability of these awards is an element of their value intended by TWA. To the extent that a FFB award may constitute “property,” the award provided to the qualifying passenger is accompanied by restrictions which are an integral part of that right. There is nothing unreasonable about this scheme.
682 F.Supp. at 1481. All of these propositions were plausible, and some indeed quite likely. However, the evidence presented by TWA was sufficient to justify none of them. Some receive support from arguments of TWA’s counsel, but counsel has not directed our attention to any evidence supporting the district court’s speculations about the cost-benefit “structure” of TWA’s program, the assumptions upon which the mileage redemption rates are based, the costs and benefits of assignability, and the tariffs’ importance to the program as a whole. We agree with the district court’s unstated assumption that all were relevant — indeed, there may be other factors that should ordinarily be considered in reaching such a judgment.[5] However, *684 assuming, as the district court did, that ACE demonstrated the applicability of the policy against restraints on alienation, we cannot agree that TWA carried its burden of proving that its restraints were reasonable.
Given the fact-intensive nature of the question with which the district court was faced, we believe the record here would be plainly inadequate for determining the reasonableness of a restriction on the transfer of almost any sort of “property.” However, we also note that the novelty and complexity of the factual setting in which this case arises makes summary judgment on the reasonableness issue inappropriate on anything less than an exhaustive investigation of the economic realities of the matter. The Supreme Court has likewise taken this consideration into account on occasion. In White Motor Co. v. United States, 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963), Justice Douglas noted, “This is the first case involving a territorial restriction in a vertical arrangement; and we know too little of the actual impact of both that restriction and the one respecting customers to reach a conclusion on the bare bones of the documentary evidence before us.” 372 U.S. at 261, 83 S.Ct. at 701. Emphasizing the importance of the facts in such a case, the Court declined to address the legal question of whether the practices were subject to the “rule of reason” or the per se approach under the Sherman Act. “We hold only that the legality of the territorial and customer limitations should be determined only after a trial.” 372 U.S. at 264, 83 S.Ct. at 702.
Similarly, in Kennedy v. Silas Mason Co., 334 U.S. 249, 68 S.Ct. 1031, 92 L.Ed. 1347 (1948), the Court noted the surpassing public importance of the question whether wartime munitions workers were covered under the Fair Labor Standards Act and vacated a summary judgment due to the technical complexity of the question and the inadequacy of the factual record. Justice Jackson explained,
We consider it the part of good judicial administration to withhold decision of the ultimate questions involved in this case until this or another record shall present a more solid basis of findings based on litigation or on a comprehensive statement of agreed facts. While we might be able, on the present record, to reach a conclusion that would decide the case, it might well be found later to be lacking in the thoroughness that should precede judgment of this importance and which it is the purpose of the judicial process to provide.
334 U.S. at 257, 68 S.Ct. at 1034. See also Anderson v. Hodel, 899 F.2d 766, 770-71 (9th Cir.1990); Eby v. Reb Realty, Inc., 495 F.2d 646, 649 (9th Cir.1974); see generally Schwarzer, Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact, 99 F.R.D. 465, 475-76 (1984).
We need not and do not go as far as the Supreme Court did in White Motor when it insisted that the issue presented in that case be decided only after trial, 372 U.S. at 264, 83 S.Ct. at 702-03. Not every novel claim or complex case must be settled through trial, and we must not let the difficulty of such cases make us hostile to summary adjudication generally. “Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed ‘to secure the just, speedy, and inexpensive determination of every action.’ ” Celotex Corp. v. Catrett, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 1). Moreover, where the ultimate fact in dispute is destined for decision by the court rather than by a jury, there is no reason why the court and the parties should go through the motions of a trial if the court will eventually end up deciding on the same record. However, just as the procedural shortcut must not be disfavored, courts must not rush to dispose *685 summarily of cases — especially novel, complex, or otherwise difficult cases of public importance — unless it is clear that more complete factual development could not possibly alter the outcome and that the credibility of the witnesses’ statements or testimony is not at issue. Even when the expense of further proceedings is great and the moving party’s case seems to the court quite likely to succeed, speculation about the facts must not take the place of investigation, proof, and direct observation.
In this case, almost no evidence supported the district court’s conclusion that TWA’s restrictions on the alienability of its travel award coupons are reasonable. The evidence that was before the district court completely failed to illuminate many areas of inquiry so important that the court thought it necessary to speculate about them. The evidence presented in this case did not warrant entry of summary judgment.
B. The Applicability of the Policy Against Restraints on Alienation of Property
As noted above, the district court appears to have assumed that the policy against restraints upon alienation of property applies to frequent flyer coupons. After making that assumption, the court found the restraints reasonable, and as we have explained, that holding cannot be upheld. However, TWA offered another ground for the enforceability of its tariffs: that frequent flyer awards are not “property” of the type that public policy regards as freely assignable. TWA characterizes these coupons instead as rights of contract, and points to many cases sustaining contractual prohibitions on assignment even of fully matured contractual rights and even when assignment would not affect the remaining duties of the obligor in any way. Because we may affirm the decision of the district court on a ground different from the one expressed in that court’s opinion as long as the record supports our alternative ground, Fidelity Fin. Corp. v. Federal Home Loan Bank, 792 F.2d 1432, 1437 (9th Cir.1986), cert. denied, 479 U.S. 1064, 107 S.Ct. 949, 93 L.Ed.2d 998 (1987), we address the argument that the public policy against restraints on alienation of property is inapplicable to TWA’s award coupons.
Even slight study of the matter makes it difficult to avoid the conclusion that we have come upon a seam in the law’s oft-proclaimed seamless web. The common law of property categorically condemns any disabling restraint that “would make it impossible for any period of time from the date of the donative transfer to transfer [an interest in property].” Restatement (Second) of Property (Donative Transfers) § 4.1(1) (1983). This has been the rule for at least five centuries, and perhaps as many as seven. See id., Introductory Note to Part II. The common law of contracts, on the other hand, developed during this same period a doctrine forbidding the assignment of a chose in action — a doctrine of almost diametrically opposite tendency. The hostility toward assignment of contractual rights (which must be distinguished from duties) has almost completely disappeared from the common law, and today the presumption is in favor of assignment. Restatement (Second) of Contracts § 317(2) (1981). However, it remains the case that an explicit contractual provision forbidding assignment of a right created by that contract is ordinarily enforceable according to its terms. Id. (“A contractual right can be assigned unless ... assignment is validly precluded by contract.” (emphasis added)); id. § 322(2) (clause prohibiting assignment is to be construed as promissory rather than disabling “unless a different intention is manifested ” (emphasis added)); id. § 322(2) comment a (“Rationale”) (“The policy against restraints on the alienation of property has limited application to contractual rights.”). See also 4A. Corbin, Corbin on Contracts §§ 872-73 (1951 & Supp.1989); 3 S. Williston, A Treatise on the Law of Contracts § 422 (3d ed. 1961) (“The question of the free alienation of property does not seem to be involved.”); 6A C.J.S. Assignment §§ 30 & 33 (1975). Thus, for purposes of the case before us, the question of whether TWA’s tariffs may be enforced seems to be a question of whether its frequent flyer coupons embody rights of property or of contract.
*686 Unfortunately, this bare dichotomy is not very helpful without more. “Property rights” and “contract rights” do not have independent existence in the world as natural kinds, detached from any consideration of human purposes. Nor are the categories mutually exclusive in common usage: When property changes hands, it quite often does so pursuant to a contract (as in this case); and contract rights, having an economic value (again, as in this case), are often referred to as “property,” as they surely are for some purposes. If the distinction between the two bodies of law is to be maintained[6] and preserved from degenerating into a jurisprudence of labels, it should be applied only after considering the competing policies underlying the doctrines in question. Unfortunately courts have not generally bothered themselves with any such inquiry, perhaps because these hoary common-law doctrines have long since taken on lives of their own, somewhat divorced from any analysis of the public policies they are supposed to vindicate. In any event, although we find that prior examinations of the conflicting concepts of property and contract rights do not provide entirely satisfactory answers to the problem that confronts us, we believe that the weight of authority strongly supports the conclusion that it is the latter and not the former that are at issue here.
Although there are no other appellate decisions addressing the character of the rights embodied by frequent flyer coupons, decisions in analogous areas suggest that these innovations in the travel market evidence rights of contract, and, thus, that the public policy against restraints on the alienation of property is no impediment to the enforcement of TWA’s tariffs. Especially informative are those cases discussing restrictions on the transfer of railroad tickets. In Bitterman v. Louisville & Nashville Railroad Co., 207 U.S. 205, 221, 28 S.Ct. 91, 96-97, 52 L.Ed. 171 (1907), the Supreme Court affirmed a preliminary injunction entered against brokers of reduced-fare railroad tickets. The brokers argued that a ticket was property, the sale of which could not be prohibited without “depriving the owner of it of an essential attribute of the property which he had acquired,” 207 U.S. at 216. The Court rejected the argument in a paragraph:
That the complainant had the lawful right to sell non-transferable tickets of the character alleged in the bill at reduced rates we think is not open to controversy, and that the condition of non-transferability and forfeiture embodied in such tickets was not only binding upon the original purchaser but upon any one who acquired such a ticket and attempted to use the same in violation of its terms is also settled. Mosher v. Railroad Co., 127 U.S. 390, 8 S.Ct. 1324, 32 L.Ed. 249 [1888]. See, also, Boylan v. Hot Springs Co., 132 U.S. 146, 10 S.Ct. 50, 33 L.Ed. 290 [1889].
207 U.S. at 221, 28 S.Ct. at 96-97. Although the result reached in Bitterman entails an implicit rejection of the brokers’ contention there (and ACE’s here), it must be admitted that the Court did not in that *687 case dearly state that railroad tickets were “contract rights” rather than “property rights.” Still, the contractual interpretation is suggested by the Court’s reference to “conditions” and “terms” being binding upon future purchasers. This interpretation is bolstered by the Court’s citation of Mosher, which characterizes a railroad ticket as “the express contract between the parties,” 127 U.S. at 394, 8 S.Ct. at 1326, and Boylan, which likewise refers to “the express conditions of the plaintiff’s contract,” which were “contained in a ticket for passage,” 132 U.S. at 150, 10 S.Ct. at 51.
The Supreme Court of Colorado was more explicit several years later in another case involving ticket brokering, Kirby v. Union Pacific Railway Co., 51 Colo. 509, 119 P. 1042 (1911). There, the court noted that “an overwhelming weight of authority” held that a ticket “evidenced” a “legal contract [that] limits the benefits of the contract to the use of the original purchaser only.” 119 P. at 1042. The court likewise regarded it as “definitely settled and fixed” “[t]hat such tickets are not property in the hands of the purchaser, in the sense that they can be transferred or sold, and trafficking in them is not and cannot be made a legitimate business.” Id. (citing cases). Equally explicit is Illinois Central Railroad Co. v. Caffrey, 128 F. 770 (C.C.E. D.Mo.1904), cited by the Supreme Court in Bitterman: “The complaining parties have the right to sell round-trip and commutation tickets over their respective roads at reduced rates, on condition that they shall only be good in the hands of the original purchasers and shall not be transferred. Contracts of this sort between a carrier and its passengers are lawful.’’ 128 F. at 772 (emphasis added). See also Corbin § 873, at 492-93 (“No one doubts that railway passenger tickets can be made non-assignable,” citing Bitterman).
Other sorts of tickets have been given similar treatment. For example, in Collister v. Hayman, 183 N.Y. 250, 76 N.E. 20 (1905), the Court of Appeals of New York upheld a provision on the back of a theater ticket which read, “If sold on the sidewalk, this ticket will be refused at the door.” 76 N.E. at 20. The provision was challenged by a “ticket speculator” who alleged that the Knickerbocker Theater’s attempt to enforce this condition interfered with his law:ful business. The court framed the “main question” as “whether the [theater] had the right to make a contract with purchasers upon the condition printed in the ticket. There is no restraint by statute against such a condition, and it is not opposed to public policy.” 76 N.E. at 21.[7]
Airline tickets are undoubtedly just as contractual in nature as railroad and theater tickets, as we have recently indicated. Deiro v. American Airlines, Inc., 816 F.2d 1360, 1365 (9th Cir.1987) (holding an airline passenger “contractually bound” by the liability limitations on his ticket coupon); Harby v. Saadeh, 816 F.2d 436, 438 (9th Cir.1987) (allowing breach of contract action for failure to provide a timely return flight, and analyzing the “term[s] of the contract”). Indeed, this court has previously refused to enforce tariffs against air *688 passengers when the airline itself has violated applicable tariffs. Coughlin v. TransWorld Airlines, Inc., 847 F.2d 1432, 1434 (9th Cir.1988) (“It is axiomatic that a material breach of an agreement warrants rescission.... TWA cannot now attempt to enforce a provision of the contract it has violated. TWA’s [conduct] effectively denied [the passenger] the benefit of her bargain with respect to the tariff agreement.”). Moreover the award coupons at issue here are actually one step removed from the ticket cases considered above, since a frequent flyer award coupon is not even a ticket; it is merely the right to receive a ticket upon redemption of the coupon. We believe this further militates against classifying these awards as “property rights.” It would be anomalous indeed if a coupon earned by performance of a contract and redeemable for another contract became “property” simply by being reduced to a cardboard voucher during its brief period of limbo.
There is, to be sure, language in some cases that tends to support the argument that tickets are “property,” but we believe most of these passing references have occurred in circumstances where “property” was equated with “things of value.” For example, we have construed section 541 of the Bankruptcy Code, 11 U.S.C. § 541, to include contract rights as “property” of the bankruptcy estate. Computer Communications, Inc. v. Codex Corp. (In re Computer Communications, Inc.), 824 F.2d 725, 729 (9th Cir.1987). The same emphasis on value explains why tickets and ticket proceeds have sometimes been declared “property” for the purposes of Article Nine of the Uniform Commercial Code, e.g. Klingner v. Pocono International Raceway, Inc., 289 Pa.Super. 484, 433 A.2d 1357 (1981). Similarly, the same principle would seem to underlie those decisions holding tickets to be “property” embraced by theft statutes, e.g. People v. Zakarian, 121 Ill.App.3d 968, 77 Ill.Dec. 366, 369, 460 N.E.2d 422, 425 (1984); Turner v. State, 372 S.W.2d 346, 347 (Tex.Crim.App.1963); but see Zakarian, 77 Ill.Dec. at 369, 460 N.E.2d at 425 (noting that at common law, “only tangible personal property could be the subject of larceny. Written documents such as deeds and contracts ... were not considered property for the purpose of larceny.”) The fact that tickets have economic value, however, cannot be dispositive for all purposes; the railroad and theater ticket cases cited above establish as much. Though tickets may be “property” for other purposes, we have discovered no case in which they were held to be “property” of the type that public policy regards as freely assignable.
In any event, we cannot condemn as empty formalism the proposition that rights of property and rights of contract are for some purposes subject to different legal rules. Contract rights generally arise between persons in an ongoing relationship, usually commercial. Those parties deal with each other, or not, depending upon the extent to which they can satisfy each other’s needs and promote each other’s purposes. There may be good reason to conclude in this situation that if a contractual restriction on the assignability of Smith’s right to receive services from Jones should for some reason become outdated, impractical, or unduly onerous, Smith and Jones can work this out between themselves. In contrast, property rights (at least in the typical case of tangibles) often survive all of the persons who were involved in their creation. As a result, enforcement of restrictions on the alienation of property might often tie up a social resource long after the death of the only people with the power to remove the restraint. Moreover, a contract-debtor often retains an interest in the completion of the contract, especially where the contract is for services; no interest of a former owner of property corresponds to this interest. Thus, it might be that the different legal rules which have developed in the two areas are necessary in order to protect this additional interest, present only in the contractual setting. See also Corbin § 873, at 479.
Finally, it is true that even within the province of contract law, there is a public policy against contracts that directly or unreasonably restrain trade. See Restate *689 ment (Second) of Contracts §§ 186-88 (1981). However, the theory that TWA’s tariffs make the contract between TWA and its passengers one that unreasonably restrains trade is one that has not been briefed or argued at any point in this case,[8] and we decline to raise and decide it on our own. We note, however, that the railroad and theater ticket cases speak directly to the argument that restraints on the transfer of analogous contract rights are unreasonable, as well as to the classification question. On the other hand, as we noted earlier, (1) frequent flyer programs constitute a fairly novel type of business device, one that has a substantial effect upon most if not all members of the travelling public; and (2) questions relating to the reasonableness of tariffs must ordinarily be resolved after an examination of their actual economic effects, see Restatement (Second) of Contracts § 186 (1981). We have already held that the record below is insufficient for such a factual inquiry.
In summary, prior judicial treatment of tickets in general and tickets of passage in particular has emphasized their contractual nature. The frequent flyer coupons before us resemble paradigmatic property rights even less than do the tickets considered by those earlier courts. Even if our predecessors did not analyze the conceptual bases for their decisions as clearly as one might have wished, we believe their determinations that the instruments at issue involved contract rights were sensible, and that consistency as well as reason dictates that we follow in their path. Consequently, we hold that the policy against restraints on alienation of property has no application to Frequent - Flyer Bonus award coupons; thus, that ancient doctrine — the only tenet of public policy on which we are asked to rule — presents no barrier to the enforcement of TWA’s tariffs against holders of brokered coupons.
IV
TWA's TORT CLAIM
The public policy analysis in which we have engaged does not fully dispose of this case. Thus far we have determined only that the public policy against restraints on alienation of property does not prevent TWA from enforcing its tariffs against its frequent flyers and their assignees, by refusing to honor coupons that have been assigned and by disqualifying the assignors from the program. We must still rule on the question whether TWA has adequately substantiated its allegations of tortious conduct on the part of ACE, whether TWA was entitled to a permanent injunction, and on ACE’s counterclaims. We first consider TWA’s tort claim, and hold that genuine issues of material fact are presented by the record below. We therefore reverse the summary judgment in TWA’s favor on that claim.
The California cause of action for tortious interference with business relations has five elements. In order to prevail, a plaintiff must show
(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant’s knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant.
Youst v. Longo, 43 Cal.3d 64, 71 n. 6, 233 Cal.Rptr. 294, 298 n. 6, 729 P.2d 728, 733 n. 6 (1987); see also Buckaloo v. Johnson, 14 Cal.3d 815, 827, 122 Cal.Rptr. 745, 752, 537 P.2d 865, 872 (1975). We agree with the district court that ACE’s conduct implicates TWA’s economic relationships with three *690 classes of third parties: program members, nonmember passengers of TWA, and travel agencies doing business with TWA. We also agree, and indeed ACE concedes, that ACE knew of each of these relationships. Nor does ACE argue that TWA’s relations with these groups were not actually disrupted by ACE’s activities. However, ACE contends most forcefully that it did not act with the intent required for liability under California law, and also that the proof of economic harm to TWA was too speculative to support a judgment in favor of the carrier. We examine each of these contentions to determine whether ACE raised a genuine issue of material fact that precluded the granting of summary judgment below.
A. The Wrongfulness of ACE’s Intent
The intent element of the business tort alleged by TWA is probably the one that has received the most attention from California courts. The California Supreme Court has repeatedly emphasized that the tort of interference with business relations, like the older and narrower tort of interference with contractual relations,[9] can only be committed by a defendant who acts with “culpable intent”:
Thus, in an action for inducing breach of contract it is essential that plaintiff plead and prove that the defendant ‘intended to induce a breach thereof....’ Similarly, to prevail on a cause of action for intentional interference with prospective economic advantage, plaintiff must plead and prove ‘intentional acts on the part of the defendant designed to disrupt the relationship.’
Seaman’s Direct Buying Serv., Inc. v. Standard Oil Co., 36 Cal.3d 752, 766, 206 Cal.Rptr. 354, 360-61, 686 P.2d 1158, 1164-65 (1984) (citations omitted). As this language from Seaman’s indicates, a plaintiff alleging interference with an economic relationship embodied in contract bears a slightly less demanding burden on the issue of wrongful intent. In Rickel v. Schwinn Bicycle Co., 144 Cal.App.3d 648, 192 Cal.Rptr. 732 (1983), the court stated, “[Wjhen the defendant induces a third party to breach a contract with the plaintiff ..., the defendant’s wrongful method ... is apparent from the allegations of fact.... No further showing of wrongfulness is necessary.” 144 Cal.App.3d at 659, 192 Cal.Rptr. at 739 (citations and footnote omitted).
The district court held that ACE’s conduct was wrongful because ACE induced its clients to sell their award coupons, in violation of the agreement between the clients and TWA.[10] ACE does not deny that it intentionally acted in a manner designed to bring about this result; rather, it contends that inducing a breach of an agreement is not wrongful if the agreement is contrary to public policy or otherwise unlawful. Put another way, ACE suggests that there is no agreement to induce a breach of, if the agreement is invalid. Because we have rejected the theory that the restrictions on transfer violated the tenet of public policy relied on by ACE, we necessarily reject ACE’s conten *691 tion. Accordingly, we agree with the district court that ACE’s conduct was sufficient under California law to show wrongful intent.[11]
ACE contends, however, that in this case we should not presume wrongfulness merely because of the breach, because Weisman always believed the tariffs in question to be unenforceable; thus, while there may have been an intent to induce a breach, there was no intent to induce a wrongful breach. The argument is creative, but ACE has not cited a single ease in California or anywhere else recognizing such a “good-faith exception” to the established rule that it is wrong to attempt to induce a breach of contract. Nor do we believe that the California courts would create such an exception, for it would be inconsistent with the principles that have governed the case-law on this element. In discussing the degree of culpability necessary for commission of this tort, the California Supreme Court has stated that “ ‘[t]he essential thing is the purpose to cause the result.’ ” Seaman’s, 36 Cal.3d at 765, 206 Cal.Rptr. at 360, 686 P.2d at 1164. ACE went to a some lengths to cause the result here — violation of the transfer restrictions — and that effort cannot be thought less wrongful merely because Weisman believed, incorrectly, that the restriction was unlawful. TWA satisfied its burden on this element.
B. Economic Harm to TWA
The district court devoted only one sentence to its finding of damages. “Finally,” wrote the court, “damages, while difficult to ascertain, are present if it is assumed that the brokered ticket holder is occupying a seat that could have been used by a legitimate frequent flyer or a passenger paying full fare.” 682 F.Supp. at 1482 (emphasis added). Thus, the court endorsed two distinct theories of damages: the displacement of “legitimate frequent flyers,” and the displacement of passengers paying “full fare.” [12]
Although we do not wish to foreclose reconsideration of the first theory on remand, we doubt its analytic soundness. TWA’s revenues would seem to be constant no matter whether a “legitimate frequent flyer” or an assignee occupies a particular seat; the salient fact in either case is that TWA receives no revenue for the seat in question. It is understandable, perhaps, that TWA conceives of these coupons as “rewards” for the exclusive use of its “legitimate” frequent flyers; but it is difficult to imagine how TWA suffers economic harm simply because those who earn these rewards decide to “use” them by selling them rather than by taking unwanted holidays. In fact, ACE contends that its business actually benefits TWA economically, by providing an incentive for very frequent flyers to continue flying on TWA even after they have earned more awards than they can personally use. Indeed, Joyce Bennis, a manager of the Frequent Flyer Bonus Program, testified at her deposition that the airline’s own marketing department believed that the popularity of TWA’s coupons among brokers like ACE actually made the program more attractive, and served to attract customers to TWA. Thus, even if this first sort of theoretical displacement exists, its net economic effect presents a genuine issue of material fact, even within TWA.
In contrast to the first displacement theory, we find the second theory somewhat more plausible. It is easy enough to imagine how TWA might be damaged, if, for instance, a fare-paying passenger wished to fly on TWA but was forced to choose an *692 other airline because TWA’s competing flight was full, due to the presence of the passenger with the brokered ticket. However, this second theory is completely unsupported by the evidence, and thus cannot support a finding of damages. ACE points out, correctly, that it is mere speculation to suppose that the hypothetical displaced passengers actually exist, or again, that they would prefer to fly on TWA rather than a competitor if that choice existed. Furthermore, even if some fare-paying passengers are displaced by users of award coupons, the identity of the coupon-users is, at least for all we know, completely irrelevant: the theoretical displaced passenger is just as displaced when a “legitimate” frequent flyer uses a coupon as when that frequent flyer’s assignee uses it in his stead; the only important question would seem to be whether the coupon is used by anyone at all.
This brings us to a damage theory not relied upon by the district court nor suggested by TWA, namely that more of the coupons will be used (and thus more passengers displaced) if a frequent flyer who does not wish to use his award is allowed to sell it to someone who does. Our difficulty in analyzing this theory is not analytic but rather evidentiary: TWA submitted no evidence whatsoever on the rate at which its coupons are redeemed. A great deal of hard statistical evidence could have been introduced to measure the effect of transfer on redemption, comparing, for example, TWA’s redemption rate to that of other airlines that allow their award coupons to be transferred without restriction; or comparing TWA’s prerestriction redemption rate with its postrestriction redemption rate; or examining the correlation, if any, between TWA’s redemption rate and ACE’s sales of Frequent Flyer Bonus Coupons. All of this evidence could have been submitted to the district court, but none of it was. Consequently, there is no basis in the record for concluding that ACE’s activities have caused TWA to give away more free seats, either in absolute terms or as a percentage of seats on each flight.
A fourth possible theory of damages is that brokered frequent flyer coupons are used by passengers who would otherwise pay TWA, rather than ACE, for their ticket. This theory is supported by the declaration of James Smith, TWA’s Director of Business Marketing. We quote the relevant paragraph in its entirety:
American Coupon Exchange’s activities are extremely damaging to TWA for a number of reasons. First, TWA is required to provide a free seat on its aircraft to a person who is not entitled to free transportation. The vast majority of brokered coupons are used for free or upgraded First Class International transportation. Fares on TWA for such transportation vary with the destination, but generally range between $3,000 and $5,000. Thus, for every brokered certificate TWA is not able to detect and confiscate, there is a loss of revenue in that amount. It is also apparent that the passengers attempting to use these brokered certificates were not travelling solely because of the fact they were using a discount-priced certificate. During the past two years TWA has confiscated in excess of 400 tickets and brokered certificates. In virtually every single instance the passenger then purchased a valid full fare ticket from TWA for the identical itinerary.
This evidence does tend to support TWA’s theories of damages, and TWA has every right to put Mr. Smith in front of a jury and ask them to believe his testimony. But it is obviously insufficient to entitle TWA to a directed verdict on this point, and it is therefore also insufficient to support a summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). It is one thing to note that “virtually every single” passenger with his vacation plans already final and perhaps uncancellable, and frequently his flight already booked, will buy a ticket as a matter of last resort if his brokered ticket is dishonored; it is quite another thing to assert that even a single such passenger would have made all the same arrangements, and would have chosen to take the same flight with the same airline, had he known in advance of making his final plans or booking his reser *693 vation that he could not use a brokered coupon to pay for a flight on that carrier.[13] Many travellers might not have travelled at all if they had known initially that they would be unable to purchase a reduced-fair ticket. Others might have chosen another airline. Indeed, ACE’s customers first consult ACE rather than TWA, and are then directed to TWA only because ACE happens to sell them a TWA coupon; if ACE were to refrain from brokering coupons for travel on TWA, ACE’s customers might well all end up on carriers that do not object to having their coupons brokered. In light of this fact, Mr. Smith’s declaration is barely probative of damages; certainly it is not “so one-sided that [TWA] must prevail as a matter of law.” Anderson v. Liberty Lobby, Inc., 477 U.S. at 252, 106 S.Ct. at 2512.
A fair amount of the hypothesizing and counterhypothesizing outlined above is, as we have said, quite plausible; little or none of it is foreclosed by the evidence. However, little or none of it is established by the evidence either. The various theories never rise above mere plausibility, and motions for summary judgment are not designed for the judicial endorsement of plausible theories. Nor are motions for summary judgment to be used as an occasion for predicting at an early stage what the record would eventually show if the facts were adequately developed. In order to prevail here, TWA was required to produce evidence that it had actually been damaged, evidence such as would compel any reasonable juror to decide in its favor. That, it totally failed to do.[14]
V
THE PERMANENT INJUNCTION
In the trial court, TWA sought both temporary and permanent injunctions against ACE, Weisman, and all persons acting in concert with them, enjoining them from brokering TWA’s award coupons. The district court denied the temporary relief because it believed that a monetary damage award would adequately compensate TWA for its financial losses. However, after granting TWA’s motion for summary judgment on its claim for tortious interference with business relations, the district court entered the requested permanent injunction on the ground that the monetary damages, while real, would be difficult to ascertain. 682 F.Supp. at 1483-84.
As we have just discussed at length, it was improper to conclude on the record before us that TWA had adequately demonstrated the existence of any monetary damages. Because the district court’s order was based solely on its now-reversed finding of damages, we also vacate the permanent injunction.[15]
VI
ACE’s AFFIRMATIVE DEFENSES
The district court characterized ACE’s argument that it acted without wrongful intent as its “only defense.” As we have seen, the requirement of wrongful intent is an element of the plaintiff’s prima facie case.[16] However, ACE did raise a number of affirmative defenses, five of which are before us on this appeal: privilege (or “justification”), unclean hands, waiver, estop-pel, and laches. ACE contends that these defenses presented genuine issues of material fact making summary judgment inappropriate.
Although ACE has consistently claimed that its conduct was not wrongful, ACE *694 has not made out any separate argument of justification. ACE pleaded this defense without elaboration in its answer, and has never provided any evidence raising a genuine issue of material fact, or even any unsupported theories about the applicability of this defense. ACE does argue, correctly, that the defense of justification depends upon numerous “factual issue[s] to be decided upon all the circumstances of the case.” Lowell v. Mother’s Cake & Cookie Co., 79 Cal.App.3d 13, 20, 144 Cal. Rptr. 664, 669 (1978). However, ACE must show not merely that justification is generally a “factual issue,” but also that its assertion of that defense presents a genuine issue of material fact in this case. For this purpose, ACE was not entitled to rest upon its pleadings but was instead obliged to present “significant probative evidence tending to support [its] legal theory.” Long v. Bureau of Economic Analysis, 646 F.2d 1310, 1321 (9th Cir.), vacated on other grounds, 454 U.S. 934, 102 S.Ct. 468, 70 L.Ed.2d 242 (1981). It has not done so on this record.
The district court did not explicitly deny ACE’s defense of unclean hands, but such a denial was of course implicit in the granting of the permanent injunction. ACE contends that TWA’s hands are unclean because (1) “TWA has been operating the FFB program in hopes that FFB members will be unable to use all of the FFB awards TWA has so vigorously encouraged them to use,” and (2) “TWA conducted some of its monitoring activities through active deception in phone calls to brokers without disclosing the true purpose of the call.” Neither of these allegations evidences conduct so unsavory that a court of equity should bar its doors. First, there is no allegation that TWA misled or deceived its passengers regarding the program. Accordingly, as long as TWA stands ready to honor its obligations, and does not unreasonably impede or obstruct the right of frequent flyers to use the coupons in the manner promised, we find nothing unconscionable in its hoping that some of those obligations may never be called in. As for the deceitful telephone calls, we note that TWA was only trying to ascertain a few facts about the secondary market in its own award coupons, and it did so in a manner that did not invade ACE’s privacy in any way.[17] Even if we were to accept the somewhat curious notion that TWA had no right to know the terms ACE was offering to the public at large, it would trivialize the clean-hands doctrine to hold that equity will not intervene against a snoop. We therefore affirm the implicit rejection of this defense by the district judge, to whose discretion the matter was committed. See Washington Capitols Basketball Club, Inc. v. Barry, 419 F.2d 472, 478 (9th Cir.1969); Fibreboard Paper Prods. Corp. v. East Bay Union of Machinists, Local 1301 227 Cal.App.2d 675, 729, 39 Cal.Rptr. 64, 97-98 (1964).
ACE’s defenses of waiver, estoppel, and laches are more problematic. ACE submitted evidence tending to show that TWA not only tolerated coupon brokering, but actually advised members of its program that they could circumvent the tariff restrictions by falsely designating their transferees as relatives. ACE argues here, as it did below, that these facts, pleaded in a variety of closely similar ways, were sufficient to bar TWA’s suit under one or more of the doctrines of waiver, estoppel, and laches. The district court rejected these arguments only by noting that TWA’s “informal monitoring methods” suggested that TWA did not intend to waive its rights against ACE.[18] The dis *695 trict court gave no reason whatsoever for rejecting ACE’s claims of estoppel and laches.
In evaluating the merit of these defenses, we must first distinguish among TWA’s claim for declaratory relief, its claim for injunctive relief, and its claim for damages arising from the tort of interference with business relations. In this case, none of the defenses bars the claim for declaratory relief. An analysis of each defense will show why.
First, since equitable estoppel arises only when a defendant has, to his detriment, reasonably relied on a plaintiff’s conduct or representations,[19] the very fact that a lawsuit eventuates would seem to us, ordinarily, to remove the estoppel prospectively from the time the lawsuit was commenced. After all, a party who sues thereby manifests an unequivocal intention to enforce his rights, making further reliance unreasonable. Thus, while prior, reasonable reliance interests should be protected, it is difficult to argue that judicial protection should extend even to the subsequent, unreasonable reliance. Of course, if ACE could demonstrate that prior to the filing of the lawsuit it engaged in some sort of long-term reliance, involving capital expenditures or something more than merely continuing to broker TWA’s coupons, then that reliance, if reasonable, might be protected even prospectively. However, ACE has neither made nor substantiated any allegations of such long-term reliance. Much the same point can be made in terms of the element of prejudice, for it is difficult to imagine how a defendant could be prejudiced by a declaration of the parties’ rights as long as that declaration operates only prospectively and does not materially affect the value of any prior investments or render some prior action less advantageous. Here, even if TWA would be es-topped from suing in tort for the damages it has allegedly sustained since ACE began brokering award coupons, it is not estopped from enforcing its tariffs prospectively against ACE’s future customers; as to those customers ACE has not yet relied on any misleading conduct by TWA, can no longer reasonably do so, and has not been prejudiced by any earlier misrepresentations of TWA’s intentions.
Likewise, it is clear that TWA did not waive its right to prospective declaratory relief here. ACE concedes that there is in this case no express, intentional relinquishment of the right to enforce the tariffs; it argues instead that TWA waived that right by acting in a manner that was “ ‘so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has been relinquished.’ ” Crest Catering Co. v. Superior Court, 62 Cal.2d 274, 278, 42 Cal.Rptr. 110, 112, 398 P.2d 150, 152 (1965) (quoting Rheem Mfg. Co. v. United States, 57 Cal.2d 621, 626, 21 Cal.Rptr. 802, 805, 371 P.2d 578, 581 (1962)). *696 However, in determining whether specific conduct is “inconsistent with an intent to enforce the right,” we cannot be blind to the character of the right in question. Although TWA’s tariffs form part of the contract the airline makes with each of its passengers, they also operate (by virtue of their being duly filed tariffs) as general statements of policy, governing TWA’s right to conduct its business in a particular way in the future. A permanent and total waiver of that right vis a vis the undifferentiated public seems to us to be a decision of such significance that we are unwilling to infer it from the conduct alleged by ACE here. The mildness of TWA’s “informal monitoring methods” may evidence some reluctance to sue brokers for tort damages, but TWA cannot be said to have permanently and completely waived its right to restrict the transfer of award coupons in the future merely because it did not race to the courthouse when it first learned of the brokers’ practices.[20]
Similar considerations apply to the equitable defense of laches. Laches bars an action for equitable relief whenever the defendant can show “unreasonable delay in bringing suit ‘plus either acquiescence in the act about which 'plaintiff complains or prejudice to the defendant resulting from the delay.’ ” Miller v. Eisenhower Medical Center, 27 Cal.3d 614, 624, 166 Cal.Rptr. 826, 832, 614 P.2d 258, 264 (1980) (emphasis added) (quoting Conti v. Board of Civil Serv. Comm’rs, 1 Cal.3d 351, 359, 82 Cal.Rptr. 337, 342, 461 P.2d 617, 622 (1969) (footnotes omitted)). For the same reasons that ACE’s evidence cannot support a finding of waiver, neither can it support a finding of acquiescence sufficient to invoke the doctrine of laches. Nor is there prejudice here, for the prejudice requirement does not mean merely that the defendant will be worse off if the relief is granted than he would be if it were not; that sort of prejudice could be claimed by all defendants all of the time. The prejudice that the doctrine of laches is designed to prevent occurs when a defendant, by reason of a plaintiffs delay, is or will be worse off than he would have been if the plaintiff had enforced his rights in a timely fashion.
Common forms of prejudice to defendant are loss of evidence to meet the claim of plaintiff, change in situation induced by the delay, and change in the value of the subject-matter involved, especially where plaintiff had the privilege of waiving or asserting his claim so that he could take advantage of either a decrease or an increase in the value.
H. McClintock, Handbook of the Principles of Equity 71-72 (2d ed. 1948); see also Trustees for Alaska Laborers-Constr. Ind. Health and Sec. Fund v. Ferrell, 812 F.2d 512, 518 (9th Cir.1987). In a declaratory relief ease, the defendant must show that the plaintiff’s delay in filing the action has made the relief sought either more burdensome or more likely to be granted. Here, the prospective relief will not cause ACE any injury it would not have incurred had the tariffs been enforced from the outset. In addition, the delay has not adversely affected ACE’s presentation of its case. In short, ACE has failed to show the type of prejudice that would warrant the withholding of declaratory relief.
A different analysis is necessary regarding the relevance of ACE’s defenses to TWA’s claim for damages arising from the tort of interference with business relations.[21] A damage award against ACE for *697 the period during which it might have been reasonable to rely on TWA’s alleged acquiescence might constitute just the sort of prejudice that is the subject of the doctrine of equitable estoppel. Abundant evidence demonstrated that TWA knew of brokers like ACE, and some of the evidence tended to support the allegation that TWA intended to encourage the activity. Moreover, had ACE known that TWA intended to sue for damages later, then ACE could have ceased its activities and avoided damages for which it may now be liable. Viewing the evidence in the light most favorable to ACE, we believe that a reasonable juror could conclude that TWA’s conduct was such as to make it reasonable for ACE to infer, prior to the filing of this action, that TWA did not intend that the tariffs be enforced. Accordingly, ACE demonstrated the existence of a genuine issue of material fact for the jury, and summary judgment should not have been granted. ACE may therefore assert this defense, with respect to the tort claim upon remand.[22]
Next, we turn to the relationship between ACE’s affirmative defenses and TWA’s request for injunctive relief. For the same reasons that those defenses do not bar prospective declaratory relief, they do not bar prospective injunctive relief. This does not mean, however, that the facts upon which ACE relies to establish those defenses have no bearing on TWA’s right to an injunction. When the district judge again considers whether to issue an injunction, ACE will be free to argue that it continued to broker TWA coupons only because TWA led it to believe that it did not object. Thus, ACE may contend that its own past conduct is not such as to justify the issuance of an injunction. Similarly, ACE may argue that there is no showing of threatened injury, that an injunction is not necessary to ensure against future tortious conduct on its part — that there is no evidence that ACE will fail to respect the tariffs now that TWA’s and the court’s positions have been made clear. We express no view as to the merits of those arguments. We simply point out that, in the case of injunctive relief, unlike that of declaratory relief, the facts involved in ACE’s affirmative defenses may be urged in opposition to the proposed remedy. And we further point out that, with respect to injunctive relief, those facts are relevant to the question whether TWA has made out its affirmative case, not to whether ACE has successfully asserted an affirmative defense to TWA’s claim.
VII
ACE’s COUNTERCLAIMS
We turn finally to the district court’s grant of summary judgment in favor of TWA on all of ACE’s counterclaims. In its third counterclaim, ACE requested a declaration that Frequent Flyer Bonus Program award coupons may be freely bartered and sold. ACE’s request was based on its contention that the tariffs restricting transfer of the coupons are contrary to the public policy in favor of the free alienation of property. The district court granted summary judgment for TWA on this counterclaim based on its determination that the tariffs did not violate that policy. Because *698 we too have rejected ACE’s argument, we affirm the summary judgment on this counterclaim.
Our conclusion with respect to TWA’s tariffs likewise leads us to affirm the district court’s entry of summary judgment for TWA on ACE’s fourth counterclaim. In that count, ACE alleged that TWA’s attempts to restrict the transfer of its award coupons interfere with ACE’s business relations with program members. The district court reasoned that since the tariffs were valid, TWA could have no wrongful intent in enforcing them. Because ACE failed to offer any legitimate reason why the tariffs should be held invalid, it failed to show that TWA did not have a right to enforce them. Accordingly, we affirm this portion of the district court’s judgment as well.
The first and second counterclaims are not as obviously dependent upon the question of the validity of TWA’s tariffs. In these counterclaims, ACE alleged that TWA and the Airlines Reporting Corporation (“ARC”), an independent organization that acts as a clearinghouse among 135 airlines and 22,000 travel agencies, conspired to drive ACE and other coupon brokers out of business. TWA and ARC allegedly pursued this goal by, among other things, refusing to honor brokered Frequent Flyer Bonus Program award coupons and terminating travel agents who dealt with brokers. ACE challenged this conduct first as a concerted refusal to deal, in violation of section 1 of the Sherman Act, 26 Stat. 209, codified as amended at 15 U.S.C. § 1, and second as an attempt to monopolize, in violation of section 2 of the Sherman Act, 15 U.S.C. § 2.[23] ACE made little or no evidentiary showing to substantiate these allegations, and the district court granted summary judgment in favor of TWA on grounds too numerous to be summarized here. On appeal, however, ACE has declined to argue the merits of its antitrust claims, and relies solely on the suggestion that the district court might have reached a different conclusion if it had found TWA’s tariffs to be contrary to the public policy against restraints on alienation of property. Since we have rejected ACE’s claim in that regard, we similarly reject its argument for reversal on the antitrust counterclaims. We decline to address the district court’s other grounds, as they have not been challenged or briefed on appeal.
CONCLUSION
Because we hold that the public policy in favor of the free alienation of property is inapplicable to frequent flyer coupons, and because that tenet of public policy is the only one relied on by ACE, we affirm the district court’s declaratory judgment in favor of TWA. We also affirm the grant of summary judgment in favor of the airline on all of ACE’s counterclaims. However, we hold that the record before the district court was insufficient to support a summary judgment on TWA’s claim for tortious interference with business relations, both because TWA failed to make out a necessary element of its prima facie case, i.e. damages, and because ACE submitted evidence sufficient to create a genuine issue of fact regarding its affirmative defense of equitable estoppel. We therefore vacate the grant of summary judgment on TWA's tort claim. In addition, because the district court based its determination to issue a permanent injunction against ACE and Weisman on its assumptions regarding damages, and because those assumptions are not supported by the requisite evidence, we vacate the part of the order awarding injunctive relief.
AFFIRMED in part, VACATED in part, and REMANDED for further proceedings consistent with this opinion.

. ACE and Weisman have participated throughout this litigation as a single entity, and we refer to them collectively throughout the rest of this opinion simply as “ACE," except where the context demonstrates a contrary intent.

. The tariff defined “relative(s)" as the "participant’s spouse, parents, children, brothers and sisters, grandparents, grandchildren, aunts, un *679 cles, nieces, nephews, first cousins and their spouses, or in-laws.”

. Apparently there were, at the time of the district court's ruling, more than forty other cou-913 F.2d — 16 pon brokers in operation. The record does not tell us how many, if any, of these other brokers make a market in TWA coupons.

. It also retained jurisdiction over TWA’s fraud claim after denying TWA's motion for summary judgment on that count.

. For example, it seems to us that in determining reasonableness the district court would be required to examine the effect of TWA’s restrictive tariffs on the overall rate of redemption for *684 its frequent flyer coupons. If the evidence showed that TWA’s redemption rate were lower than the redemption rate for those competitors who allow transfer, or that TWA’s redemption rate had dropped significantly after TWA restricted transfer of its awards, that evidence might support some of the assumptions made by the district court.

. ACE has cited one important case that tends toward the obliteration of any distinction between property rights and contract rights. In Portuguese-American Bank v. Welles, 242 U.S. 7, 11, 37 S.Ct. 3, 3-4, 61 L.Ed. 116 (1916), Justice Holmes wrote, “When a man sells a horse, what he does, from the point of view of the law, is to transfer a right, and a right being regarded by the law as a thing, even though a res incorporal-is, it is not illogical to apply the same rule to a debt that would be applied to a horse." Not illogical, perhaps; but neither is it logically necessary. Courts have thought for hundreds of years contract law and property law were each distinct and necessary, and we should not assume that they are redundant merely because they both govern the transfer of "things,” which can be intangible as well as tangible.
Justice Holmes’s obiter dictum (for the assignment in Portuguese-American Bank was held to have been approved by the obligor, who had the power to do so) has been harshly criticized. See, e.g., Corbin on Contracts § 873, at 487-89; Grismore, Effect of a Restriction on Assignment in a Contract, 31 Mich.L.Rev. 299, 301-02 (1933) ("The decision ... does not pretend to make a careful analysis of the problem.’’). Moreover, it seems to ignore contrary indications in earlier opinions of the Supreme Court, e.g., Arkansas Valley Smelting Co. v. Belden Mining Co., 127 U.S. 379, 387, 8 S.Ct. 1308, 1309, 32 L.Ed. 246 (1888), and is flatly contradicted by later decisions discussed infra. We do not follow it.

. Interestingly, the Collister court did not consider the ticket itself to be a contract:
The ticket is not a contract, although to some extent it is evidence thereof. The contract is implied from the circumstances, and is an agreement on the part of the proprietor, for the consideration mentioned, to admit the holder of the ticket, upon presentation thereof, to his theater at the date named, with the right to occupy the seat specified and to there witness the performance. A theater ticket is a license, issued by the proprietor, pursuant to the contract, as convenient evidence of the right of the holder to admission to the theater at the date named, with the privilege specified, subject, however, to his observance of any reasonable condition appearing upon the face thereof. The license, although granted for a consideration, is revocable for a violation of such condition by the holder of the ticket in the manner specified therein.
76 N.E. at 21 (emphasis added). While a license is neither a contract nor an interest in the subject property, 53 C.J.S. Licenses § 92, at 441 (1987), the Collister court’s classification of a ticket as a license has some appeal, at least from a theoretical standpoint. However, practically, for purposes of the case before us, it appears to matter little in this context whether tickets are treated as licenses or contracts, as the Collister result demonstrates. In any event, later decisions have not followed Collister's license theory; the contractual analysis has greatly predominated, and we adopt it here.

. Although ACE did allege below that TWA was violating the Sherman Act's prohibition on contracts in restraint of trade, 15 U.S.C. § 1, the subject of this challenge was not the contract(s) between TWA and its passengers, but rather the contract between TWA and an industry-wide clearinghouse known as the Airlines Reporting Corporation. This antitrust counterclaim, discussed in Part VII infra, does not challenge the enforceability of the tariffs themselves; instead, it assumes the tariffs are unenforceable and based on that assumption alleges that TWA and ARC are trying to destroy competition in a legitimate market for frequent flyer certificates.

. California follows the “great weight of authority,” Buckaloo, 14 Cal.3d at 823, 122 Cal.Rptr. at 749, 537 P.2d at 869, in regarding tortious interference with business relations as a general business tort of which tortious interference with contractual relations is only one type. Seaman's Direct Buying Serv., Inc. v. Standard Oil Co., 36 Cal.3d 752, 765-66, 206 Cal.Rptr. 354, 360-61, 686 P.2d 1158, 1164-65 (1984); Buckaloo, 14 Cal.3d at 823, 122 Cal.Rptr. at 749, 537 P.2d at 869.

. The district court considered the "wrongfulness” question to be a "defense" rather than an element of TWA's prima facie case. However, California law is to the contrary:
Only if and when plaintiff establishes an "intent to interfere" does the issue of "justification” come into play. (Lowell v. Mother's Cake and Cookie Co., [79 Cal.App.3d 13, 18-19, 144 Cal.Rptr. 664, 668 (1978) ]) "[W]hile defendant’s culpable intent is an element of the cause of action to be pleaded and proved by plaintiff, defendant’s justification is an affirmative defense” in the torts of interference with an existing or prospective economic relationship. (A.F. Arnold & Co. v. Pacific Professional Ins., Inc. (1972) 27 Cal.App.3d 710, 714, 104 Cal.Rptr. 96.)
Seaman’s, 36 Cal.3d at 766, 206 Cal.Rptr. at 361, 686 P.2d at 1165. This error, however, does not affect the substance of the matter, and we therefore consider the district court’s determination as a finding of wrongful intent.

. The district court also found that ACE wrongfully violated 49 U.S.C. App. § 1373(b)(1), which prohibits ticket agents from charging any fare other than the fare specified in the applicable tariffs. Section 1373(b)(1) ceased to be in effect as of January 1, 1983. 49 U.S.C. App. § 1551(a)(2)(A). It therefore bears no relevance to ACE's conduct.

. We understand the district court to mean "full fare” primarily in contrast to the deeply discounted fares available through brokers, not in contrast to the economy fares sometimes offered by the airlines subject to certain restrictions. Presumably, the important question is whether TWA would otherwise have earned any fare from the occupant of a particular seat, rather than none at all. This distinction, however, goes only to the amount of damages, not to their existence.

. The further contention that "every brokered certificate" represents a loss in revenue equivalent to the cost of a ticket for first-class travel to international destinations does not merit comment.

. Although it denied TWA’s motion for summary judgment on its fraud claim against ACE, the district court did indicate that it found four of the five elements of fraud, including the damage element, satisfied. Our discussion of damages in the context of the tortious interference claim applies equally to the fraud claim.

. Although the court also referred to the possibility of future harm, it appears it had in mind harm of the same type as the harm discussed above.

. See note 9 supra.

. We also note that Weisman states by affidavit that he obtained information from TWA in exactly the same way.

. The court cited Royal Typewriter Co. v. Xerographic Supplies Corp., 719 F.2d 1092, 1104 (11th Cir.1983), for the proposition that TWA did not, as a matter of law, waive its tort claims by continuing to do business with ACE. 682 F.Supp. at 1482. The court also cited Thor Power Tool Co. v. Weintraub, 791 F.2d 579, 585 (7th Cir.1986), for the proposition that "[w]hen, after substantial performance, it would be economically unfeasible for a defrauded party to terminate a business relationship after the fraud has been discovered, that party may continue the relationship and then bring a suit for damages.” 682 F.Supp. at 1482. Neither case supports the district court’s order.
*695 First, the relevant portion of Thor Power Tool pertains only to damages; the Seventh Circuit there noted the general rule that a defrauded party cannot recover damages accruing after discovery of the fraud because any further reliance thereafter is unreasonable. The proposition quoted by the district court is merely an exception to this general rule, applied in Thor Power Tool, and it has nothing to do with waiver, estoppel, or laches. Second, the court in Royal Typewriter — applying Florida law, see Bissett v. Ply-Gem Indus., Inc., 533 F.2d 142, 151 (5th Cir.1976) — held only that one who continues to do business with the perpetrator of a fraud does not thereby automatically waive the right to sue later. 719 F.2d at 1104. The court did not hold that, as a matter of law, there could not possibly be any waiver under such circumstances; indeed, the appellate court in Royal Typewriter held that the issue was properly submitted to the jury. Id.

. See Lentz v. McMahon, 49 Cal.3d 393, 261 Cal.Rptr. 310, 777 P.2d 83 (1989):
Generally speaking, four elements must be present ...: (1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury.
261 Cal.Rptr. at 312, 777 P.2d at 85 (quoting City of Long Beach v. Mansell, 3 Cal.3d 462, 489, 91 Cal.Rptr. 23, 42, 476 P.2d 423, 442 (1970); and Driscoll v. City of Los Angeles, 67 Cal.2d 297, 305, 61 Cal.Rptr. 661, 666, 431 P.2d 245, 250 (1967)). Accord United States v. Georgia-Pacific Co., 421 F.2d 92, 96 (9th Cir.1970).

. Moreover, the notion of a permanent and total waiver raises other conceptual difficulties in this context. Just how permanent could it be? Could TWA, after such a waiver, nonetheless issue a new tariff rescinding its waiver? What if TWA repealed its existing tariffs and then reissued them in identical form? Could it then enforce the new tariffs as long as it did so vigorously from the start? The difficulties which lurk in the concept of a permanent waiver further persuade us that the facts apparent from this record, even viewed in the light most favorable to ACE, cannot support the application of the doctrine here,

. We hope it is clear that, strictly speaking, the distinction we draw turns not upon the remedy, but rather upon the nature of the rights vindicated and the conduct affected thereby. In this case, the claim for declaratory relief vindicates rights which have not yet been violated and governs future transactions only. We do not mean to intimate, however, that ACE’s defenses would be similarly inapplicable to a prayer for a *697 declaration that ACE committed a tort, unaccompanied by a prayer for damages; nor, for example, a request for a declaration that such- and-such a contract or obligation (coverage under an insurance policy, for example) had never existed.

. We need not address whether ACE's evidence would be sufficient to support a defense of laches, since it appears that laches may not be pleaded in defense to an action at law in California. Abbott v. Los Angeles, 50 Cal.2d 438, 461, 326 P.2d 484, 498 (1958); 11 B. Witkin, Summary of California Law, Equity § 14, at 691 (9th ed.1990); but cf. Fibreboard Paper Prods. Corp. v. East Bay Union of Machinist, Local 1304, 227 Cal.App.2d 675, 728, 39 Cal.Rptr. 64, 97 (1964) (defense of unclean hands, traditionally available only in equity, can be asserted in an action at law because the distinction between actions at law and suits in equity has been abolished). However, on remand the district court may wish to reconsider whether with respect to the tort claim the defense of waiver should be reinstated along with the estoppel defense. The two defenses are closely related, and neither the district judge nor the parties discussed them separately. Under the circumstances, we prefer to allow the district court to give initial consideration to whether both or just one should be reinstated.

. As noted in note 7 supra, ACE did not challenge the competitive effect of the tariffs themselves.