967 F.2d 410
 1992-1 Trade Cases P 69,870
 AMERICAN AIRLINES, Plaintiff/Counter-Defendant-Appellee,
v.
Randall CHRISTENSEN, Coupon Connection, Ernest W. Carlson,
Bruce H. Briggs, Robert J. Baumann, Curtis R.
Sweeten and Tonya K. Sweeten,
Defendants-Appellants,
Platinum World Travel and Texas Budget Flights, Inc., dba
"Texas Traveler", Defendants / Counter-claimants-Appellants.
 No. 91-4047.
 United States Court of Appeals,
Tenth Circuit.
 June 17, 1992.
 
 Paul D. Newman of Ray, Quinney & Nebeker, Salt Lake City, Utah (Rick B. Hoggard of Ray, Quinney & Nebeker, Samuel Alba and M. David Eckersley of Prince, Yates & Geldzahler, Salt Lake City, Utah, and Scott Wangsgard of Conder & Wangsgard, West Valley City, Utah, with him on the brief), for defendants-appellants.
 Richard A. Rothman of Weil, Gotshal & Manges, New York City (Bonnie Garone and Kenneth L. Metzner of Weil, Gotshal & Manges, New York City, and Stewart M. Hansen, Jr. and Paul M. Simmons of Suitter Axland Armstrong & Hanson, Salt Lake City, Utah, with him on the brief), for plaintiff-appellee.
 Before TACHA, BALDOCK, and EBEL, Circuit Judges.
 EBEL, Circuit Judge.
 
 
 1
 This appeal raises three issues. First, did the district court err by holding that the Plaintiff's "no-sale" rule was enforceable as a matter of law without undertaking an analysis of its "reasonableness"? Second, did the Plaintiff demonstrate an injury sufficient to warrant a partial summary judgment as to liability and the issuance of a permanent injunction? And third, was there sufficient proof to hold each of the individual Defendants liable? We answer the first question in the negative and the second and third questions in the affirmative. Accordingly, we affirm the district court's grant of partial summary judgment and injunctive relief for the Plaintiff, 769 F.Supp. 1203.
 
 FACTS
 
 2
 The Plaintiff, American Airlines ("American"), operates a promotional frequent flyer program called the AAdvantage program. Under this program, members earn "miles" by flying on American or by doing business with American affiliates. A member can then trade in these "miles" for travel awards. The award application form requires the member to confirm that he or she will not sell, barter, or exchange the award for cash or other consideration. The application, as well as the award itself, clearly states that any award that has been sold, bartered, or exchanged for consideration is void. This rule is often referred to as the "no-sale" rule. Although members may not sell an award, they may give awards as gifts to anyone they choose.
 
 
 3
 The Defendants are in the business of brokering travel awards, including those from American's AAdvantage program. They buy awards from program members and sell them to travellers seeking discount fares. It is undisputed that the Defendants knew about American's "no-sale" rule and that they utilized several methods to evade the rule. These methods included altering airline tickets, manufacturing phony identification cards in the names of members from whom awards were purchased to "facilitate ticketing," instructing the buyers to lie to American agents by telling the agents that the tickets were a gift from the seller, and providing "cheat sheets" to help buyers avoid detection by appearing to be familiar with the seller to back up the "gift" story. Additionally, the Defendants "manufactured" mileage by paying people to fly under false names in which the Defendants held AAdvantage accounts.[1]
 
 
 4
 American sued the Defendants on several theories, including tortious interference with contract and unfair competition.[2] American moved for and was granted summary judgment as to liability on these two claims. Based upon the summary judgment ruling, the district court granted American a permanent injunction prohibiting the Defendants from buying, selling, or brokering AAdvantage awards. The Defendants appeal from the injunction and the grant of summary judgment upon which the injunction is based under 28 U.S.C. § 1292(a)(1).[3]
 
 I. The Enforceability of the "No-Sale" Rule
 
 5
 It is undisputed that the "no-sale" rule is part of a contract between American and any member of its AAdvantage program who receives an award. American offers awards to members who meet certain conditions, including turning over to American a specified number of "miles" and promising to adhere to the "no-sale" rule. When a member satisfies the conditions, a contract is formed. Pursuant to that contract, American issues the award. American demonstrated that the Defendants knew of the existence of such contracts and their "no-sale" term and nevertheless induced AAdvantage members to breach that term. See Bunnell v. Bills, 13 Utah 2d 83, 368 P.2d 597, 602 (1962) ("one who persuades another ... to breach a contract is guilty of an actionable tort" with certain exceptions not applicable here).[4]
 
 
 6
 The Defendants do not deny knowing about the "no-sale" term or inducing AAdvantage members to breach that term. Rather, the Defendants argue that the "no-sale" rule is unenforceable as contrary to public policy. Specifically, the Defendants argue that the "no-sale" rule violates the public policy against "restraint of trade." Appellant Br. at 14 (citing Restatement (Second) of Contracts §§ 178 & 186 (1981)).[5] Thus, the Defendants argue, they did not interfere with a valid contractual term.
 
 
 7
 "A public policy against the enforcement of promises or other terms may be derived by the court from (a) legislation relevant to such a policy, or (b) the need to protect some aspect of the public welfare, as is the case for the judicial policies against, for example, (i) restraint of trade." Restatement (Second) of Contracts § 179. However, the Defendants have not cited, and we are unaware of, any legislative or decisional authority hostile to contractual provisions such as the "no-sale" rule that restrict alienation of contractual rights.
 
 
 8
 The Defendants cite 15 U.S.C. § 1 of the Sherman Act, 15 U.S.C. § 45(a)(1) of the Federal Trade Commission Act, Utah Code Ann. § 13-5-2.5(1) of the Utah Unfair Practices Act, id. § 76-10-914 of the Utah Antitrust Act, and the Utah Constitution's Property Clause, Utah Const. art. I, § 1, as embodiments of the public policy against restraining trade. However, none of these enactments apply to the "no-sale" rule.
 
 
 9
 "Section 1 of the Sherman Act requires that there be a 'contract, combination ... or conspiracy' ... in order to establish a violation.... Independent action is not proscribed." Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 761, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984) (citation omitted); accord Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 768, 104 S.Ct. 2731, 2740, 81 L.Ed.2d 628 (1984). However, the Defendants have alleged no concerted action by American. No evidence in the record suggests that American did not independently set the terms under which it would offer its travel awards, and the mere fact that its members accepted those terms does not generate the kind of concerted action needed to violate Section 1. See Monsanto, 465 U.S. at 761, 104 S.Ct. at 1469.
 
 
 10
 The Federal Trade Commission Act specifically excludes air carriers from its purview. 15 U.S.C. § 45(a)(2). Additionally, as conceded by the Defendants below, there is no private right of action under this statute. Baum v. Great Western Cities, Inc., of New Mexico, 703 F.2d 1197, 1209 (10th Cir.1983). Similarly, the Utah Unfair Practices Act specifically excludes common carriers. Utah Code Ann. § 13-5-2.5(2).
 
 
 11
 It does not appear that the Defendants raised the Utah Antitrust Act as a source of public policy below. Moreover, the Utah Antitrust Act, which is essentially identical to the Sherman Act, instructs that its construction is to be "guided by interpretations given by the federal courts to comparable federal antitrust statutes...." Utah Code Ann. § 76-10-926. Thus, the Utah Antitrust Act does not apply for the same reason that the Sherman Act does not apply. With regard to the Property Clause of the Utah Constitution, we know of no authority holding that Clause applicable to the alienation of contract rights such as those at issue here.
 
 
 12
 In addition to the above asserted sources of public policy, the Defendants point to the Texas Deceptive Trade Practices and Consumer Protection Act, Tex.Bus. & Com.Code Ann. § 17.46, as an embodiment of the alleged public policy against restraint of trade. We are not persuaded that Texas law applies in this case. In any event, the statute cited, which prohibits "[f]alse, misleading, or deceptive acts or practices," does not reflect a public policy against American's "no-sale" rule.
 
 
 13
 Finally, the Defendants suggest that the Second Restatement of Contracts itself provides a prohibition against the enforcement of American's "no-sale" rule. The Restatement provides: "(1) A promise is unenforceable on grounds of public policy if it is unreasonably in restraint of trade. (2) A promise is in restraint of trade if its performance would limit competition in any business...." Restatement (Second) of Contracts § 186. However, section 186 generally does not extend a cause of action beyond that provided by other federal and state laws such as those discussed above. See id. cmt. b. We conclude that section 186 does not provide an independent cause of action in this case.
 
 
 14
 Thus, none of the laws cited by the Defendants proscribe conduct such as American's promulgation or enforcement of its "no-sale" rule. To the extent that the Defendants suggest that the public policy that is manifested by these statutes is somehow more inclusive than the statutes themselves, we disagree. The limitations contained in a statute must be considered as much a part of the policy manifested by a statute as the statute's prohibitions. Further, we are mindful of Utah's practice of interpreting public policy very narrowly. Cf. Berube v. Fashion Centre, Ltd., 771 P.2d 1033, 1043 (Utah 1989) (noting, in context of public policy exception to employment-at-will rule, that "we will construe public policies narrowly and will generally utilize those based on prior legislative pronouncements or judicial decisions, applying only those principles which are so substantial and fundamental that there can be virtually no question as to their importance for promotion of the public good") (footnote omitted).
 
 
 15
 The Defendants also assert error in that the district court denied them certain discovery geared toward proving the unreasonableness of the "no-sale" rule.[6] However, there is no general principle that a contract must pass a reasonableness test before it will be enforced. Parties are free to agree among themselves to unreasonable terms and conditions so long as no legally cognizable right is violated. Here the Defendants have failed to identify any legally cognizable right violated by American's "no-sale" rule, and thus the district court did not abuse its discretion in denying further discovery on the issue of the reasonableness of that provision.
 
 
 16
 Rules restricting the transfer of contract rights such as the "no-sale" rule are regularly enforced without inquiry into their reasonableness.
 
 
 17
 That [a carrier] had the lawful right to sell non-transferable tickets ... we think is not open to controversy, and that the condition of non-transferability and forfeiture embodied in such tickets was not only binding upon the original purchaser but upon any one who acquired such a ticket and attempted to use the same in violation of its terms is also settled.
 
 
 18
 Bitterman v. Louisville & Nashville R.R., 207 U.S. 205, 221, 28 S.Ct. 91, 96, 52 L.Ed. 171 (1907); see also Transworld Airlines, Inc. v. American Coupon Exchange, Inc., 913 F.2d 676, 685-88 (9th Cir.1990) ("TWA ") (holding that frequent flyer coupon rights are rights of contract rather than property rights and concluding that "an explicit contractual provision forbidding assignment of a right created by [the] contract is ordinarily enforceable according to its terms"); Kirby v. Union Pac. Ry., 51 Colo. 509, 119 P. 1042, 1046 (1911) (citing Bitterman ); John D. Calamari & Joseph M. Perillo, The Law of Contracts § 18-16, at 740 (3d ed. 1987) (If a provision against assignment of rights under a contract "expressly states that any assignment shall be void, ... the courts have generally held that [a] purported assignment is ineffective....") (footnote omitted); Arthur L. Corbin, Corbin on Contracts § 873, at 492-93 (1951) ("No one doubts that railway passenger tickets can be made non-assignable....") (footnote omitted).[7] Accordingly, we hold that the "no-sale" rule is enforceable as a matter of law.[8]
 
 II. Damages
 
 19
 Although the summary judgment for American was solely on the issue of liability, leaving the determination of damages to a later time, the Defendants argue that American has failed to demonstrate any damages, a necessary element of both its interference with contract and unfair competition claims. American does not dispute the necessity of proving some damages in order to prevail on these claims but offers three theories of damages: misappropriation of services, nominal damages, and unjust enrichment.[9]
 
 
 20
 American's first argument with respect to damages is that the Defendants, through their actions, caused American's services to be misappropriated. The district court found as a matter of law that the Defendants had misappropriated American's services, and we agree. As noted above, the "no-sale" rule was an enforceable term of the contract under which the awards were granted. That term rendered the brokered awards void. Thus, those whom the Defendants encouraged to buy and travel on the void awards were essentially stowaways, passengers without valid tickets. See Harmon v. Jensen, 176 F. 519, 524 (6th Cir.1909) (equating ticket transferred in violation of prohibition on transfer to counterfeit ticket); Broyles v. Central of Ga. Ry., 166 Ala. 616, 52 So. 81, 83 (1909) (declaring that passenger wrongfully using nontransferable ticket is trespasser). As the Colorado Supreme Court said in a similar case involving brokers of nontransferable railroad tickets,
 
 
 21
 [t]here is no process of reasoning, however strained, which can even as a matter of form conceal the ultimate fact, that the [carrier] is deliberately cheated out of the regular fare on every mile of its line on which travel is made under color of one of these tickets in the hands of any one other than the original purchaser.
 
 Kirby, 119 P. at 1045.[10]
 
 22
 The Defendants argue that American offered no proof that the buyers of the awards would have bought tickets on American if they had not purchased the brokered awards or that the buyers of the awards occupied seats that would otherwise have been filled. However, such proof is not necessary. The fact that a stowaway would not have bought a ticket if he could not travel for free or that he occupies a seat that might have remained empty does not make him less of a stowaway. Whether or not he would have paid for a ticket, and whether or not the seat that he occupies would have been filled, the stowaway misappropriates the services of the carrier. Because this misappropriation resulted from actions by the Defendants, it is clear that the Defendants damaged American.
 
 
 23
 The Defendants rely heavily on TWA for the proposition that American has not been damaged. TWA, however, did not address any of the theories of damages advanced by American. Rather, that case found insufficient proof of damages on four specific, proof-intensive theories of damages. 913 F.2d at 691-93. The misappropriation theory advanced by American, in contrast, only requires proof that the defendants caused invalid awards to be used.[11]
 
 
 24
 Because we have no doubt that the Defendants damaged American by encouraging the misappropriation of its services, we do not address American's other theories of damages.
 
 
 25
 III. Identification of Conduct by Individual Defendants
 
 
 26
 The final argument advanced by the Defendants is that, even though the corporate Defendants engaged in the conduct alleged by American, there was no proof that the individual Defendants personally committed any of the alleged acts. Accordingly, the Defendants argue, the district court erred in granting summary judgment against those individual Defendants on the issue of liability. We disagree.
 
 
 27
 It is well settled that "if an officer or agent of a corporation directs or participates actively in the commission of a tortious act or an act from which a tort necessarily follows or may reasonably be expected to follow, he is personally liable to a third person for injuries proximately resulting therefrom." Lobato v. Pay Less Drug Stores, Inc., 261 F.2d 406, 408-09 (10th Cir.1958).[12] "Specific direction or sanction of, or active participation or cooperation in, a positively wrongful act of commission or omission which operates to the injury or prejudice of the complaining party" will subject an officer or agent of a corporation to liability for the tort of the corporation. Id. at 409.
 
 
 28
 It is clear that each of the individual Defendants directed or participated actively in the corporate Defendants' activities.[13] The tortious conduct of the corporate Defendants pervaded their business. That is, the businesses were set up to interfere with known contracts between the airlines and their frequent flyers and to misappropriate the airlines' services through deceptive means.[14] Thus, the individual Defendants' direction of and active participation in the business of the corporate Defendants is sufficient to subject them to liability for the tortious conduct of the corporate Defendants.[15]
 
 
 29
 Thus, American has adequately demonstrated that it is entitled to summary judgment on the issue of liability for tortious interference with contract and unfair competition. Accordingly, we AFFIRM the grant of summary judgment on these issues by the district court and the issuance by that court of a permanent injunction.
 
 
 
 [1]
 Although the Defendants admit to engaging in these deceptive practices generally, they argue that there is no evidence that these practices were utilized with respect to the thirty-two transactions in the record. However, the district court found that "[t]he defendants developed and utilized an elaborate system of deception to prevent American from identifying defendants' wrongful transactions." II Appellant App., Ex. 30, at 12. The record supports this finding
 
 
 [2]
 American filed in federal court because some of its claims arise under federal law. The two claims on which American received summary judgment, however, are pendant state law claims. Although the district court did not make any explicit determination regarding choice of law, its decision appears to rest upon Utah law. The parties do not challenge the application of Utah law. Thus, we apply Utah law
 
 
 [3]
 Although the Defendants' appeal is from the interlocutory order, which is necessary to confer jurisdiction pursuant to 28 U.S.C. § 1292(a)(1), they do not attack the propriety of the injunction except in conjunction with their attack on the summary judgment. Accordingly, our review is de novo. Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir.1990)
 
 
 [4]
 The Defendants argue that they did not interfere with an existing contract, but rather with a prospective contract. They assert that the contract is not formed until after the member accepts an award; yet in most instances the Defendants attempted to induce the sale of an award before it was issued. Thus, the Defendants argue, American's claim is properly for tortious interference with prospective economic relations. This tort, unlike that for interference with an existing contract, requires proof that the defendant acted "for an improper purpose or by improper means." See Leigh Furniture & Carpet Co. v. Isom, 657 P.2d 293, 304 (Utah 1982)
 Although it appears to us that the Defendants' activities interfered with existing contractual relations, because the breach that the Defendants induced occurred after the AAdvantage member received (or pretended to receive) the award, we do not need to decide that issue. The means utilized by the Defendants at bar clearly satisfy Isom's higher standard in any event. " 'Commonly included among improper means are ... deceit or misrepresentation....' " Id. at 308 (quoting Top Service Body Shop, Inc. v. Allstate Ins. Co., 283 Or. 201, 582 P.2d 1365, 1371 & n. 11 (1978)). It is undisputed that the Defendants used deceit and misrepresentation in their activities. Although the Defendants suggested below that the deceit necessary under Isom had to be directed at the party induced to breach the contract, the Defendants have not cited, and we are unaware of, any authority for this proposition.
 
 
 [5]
 Although the Defendants have cited no authority indicating that Utah has adopted these sections of the Second Restatement, Utah does appear to have at least endorsed the principles underlying these sections. In Zion's Service Corp. v. Danielson, 12 Utah 2d 369, 366 P.2d 982 (1961), the Utah Supreme Court stated: "[A] contract which is, by its terms, an unreasonable restraint of trade is invalid as against public policy. With [this] there can be no argument." Id. at 985 (citing, among other authorities, Restatement of Contracts § 517, a predecessor to the sections of the Second Restatement cited by the Defendants). Thus, for purposes of this opinion, we will assume that Utah has adopted the principles underlying the Second Restatement, if not the Restatement itself
 
 
 [6]
 We note that significant discovery had taken place in terms of depositions and production of documents. The particular discovery that the Defendants complain about being denied was exceedingly broad
 
 
 [7]
 The Defendants contend that Bitterman and the other railroad ticket cases are inapposite. First, they argue that the tickets involved in those cases permitted no transfer, while American's award tickets permit transfer so long as it is uncompensated. Thus, the Defendants argue, the railroad ticket transferability restrictions were more reasonable than American's "no-sale" rule. To the contrary, if Bitterman affirmed a complete ban on non-transferability, we think that American's more limited restrictions here would also pass muster. Moreover, to the extent that the Defendants' argument is that a partial restriction on transferability is less reasonable than a total restriction, as discussed above, reasonableness is generally irrelevant to the enforceability of restrictions on the alienation of contract rights. Second, the Defendants argue, the power to issue non-transferable reduced rate railroad tickets derived from a railroad statute that does not apply to American. However, Bitterman expressly noted that the cases which controlled the question were decided prior to the passage of that statute. 207 U.S. at 221, 28 S.Ct. at 96-97. Thus, the right of a rail carrier to issue such tickets does not appear to derive from the railroad statute
 
 
 [8]
 The Defendants state, in a footnote to their brief, that their other affirmative defenses, justification and unclean hands, "are based upon some of the same conduct of American of which the defendants sought discovery relevant to the issue of the reasonableness of the No-Sale Rule" and are "inextricably intertwined with" that issue. Appellant Br. at 20 n. 14. However, the Defendants declined to address these affirmative defenses separately in their brief on appeal. Because the Defendants fail to show how these defenses are connected with their argument for discovery geared toward a "rule of reason" analysis, much less "inextricably intertwined" with that argument, we do not consider these affirmative defenses to have been raised on appeal. It is insufficient merely to state in one's brief that one is appealing an adverse ruling below without advancing reasoned argument as to the grounds for the appeal. See Fed.R.App.P. 28(a)(4) ("The brief of the appellant shall contain ... [a]n argument.... The argument shall contain the contentions of the appellant with respect to the issues presented, and the reasons therefor, with citations to the authorities, statutes and parts of the record relied on."). Accordingly, we do not consider the Defendants' affirmative defenses of justification and unclean hands
 
 
 [9]
 American urges that the existence of damages is a factual matter, reviewable only for clear error. However, because we are concerned primarily with the validity of a theory of damages and only secondarily with whether there is sufficient evidence to support that theory, our review is de novo
 
 
 [10]
 Although we find no direct proof in the record that any of the brokered awards were actually used for travel, the Defendants do not appear to argue that none of the thirty-two brokerage transactions documented in the record resulted in a passenger flying on a brokered award. Such an argument, if made, would strain credulity, as each of the awards was purchased for a substantial sum of money, and the documents show that tickets were issued for specific flights in several of the transactions
 
 
 [11]
 Moreover, American would prevail under at least one of the theories analyzed in TWA. That case indicated that if an airline could prove an increase in the number of awards redeemed, the airline would be entitled to damages. TWA, 913 F.2d at 692. The Defendants at bar admitted that their conduct resulted in the redemption of "miles" which would otherwise go unused. "[I]f the coupon brokerages were eliminated American Airlines would not have to provide some of the benefits promised and earned by frequent flyers in part because the mileage accumulated in frequent flyer accounts would go unredeemed." I Appellant App.Ex. 6, at 26-27. Thus, by increasing the number of "miles" used, brokers such as the Defendants effectively increase the cost of the AAdvantage program to American
 
 
 [12]
 Although Lobato apparently applied New Mexico law, we believe that Utah would follow the principle enunciated in that case
 
 
 [13]
 The district court found, and the Defendants admit, that the individual Defendants were, with the exception of Defendant Christensen, officers and directors of the corporate Defendants. Defendants Carlson and Briggs started these businesses. Defendant Carlson took care of advertising and the procurement of awards. Defendant Briggs was the President and Chief Operating Officer of Platinum World Travel. Defendant Baumann was responsible for the retail sale of awards and personnel. Defendant Curtis Sweeten was in charge of European sales, wholesale operations, and special projects. Defendant Tonya Sweeten was the manager of procurement of awards at Platinum World Travel. Although the record does not indicate that Defendant Christensen was an officer or director of any of the corporate Defendants, and although Christensen characterizes his work for the corporate Defendants as that of an independent contractor, the record shows that he was the comptroller for all of the corporate Defendants and that he participated in personnel recruitment and advertising. In his capacity as a personnel agent for the corporate Defendants he demonstrated a detailed knowledge of the operations of the corporate Defendants and represented that these operations were legal. He also made personnel decisions. Thus, Christensen's participation in the corporate Defendants' torts of unfair competition and tortious interference with contract must be considered active
 
 
 [14]
 As we discussed above, such conduct satisfies the elements of the tort of interference with an existing or prospective contract. This conduct also satisfies the elements of the tort of unfair competition. See Budget System, Inc. v. Budget Loan & Finance Plan, 12 Utah 2d 18, 361 P.2d 512, 514 (Utah 1961) (deception for purposes of misappropriating good will of another business is unfair competition); Dubuque Products, Inc. v. Lemco Corp., 227 F.Supp. 108, 122 (D.Utah 1963) (deception for purposes of misappropriation of know-how and good will from another business is unfair competition). The Defendants argued below that the tort of unfair competition is limited to deception of consumers--i.e., where a defendant misappropriates elements of a competitor's business that would deceive a consumer into believing that its products or services were those of its competitor. Because the thrust of the deception by the Defendants is directed at American, they argued, they could not be liable for unfair competition. The district court disagreed with this argument by the Defendants and held them liable for unfair competition. Because the Defendants do not take issue on appeal with this holding, we will assume for purposes of this appeal that the tort of unfair competition is not limited to deceptive misappropriation directed at consumers
 
 
 [15]
 The Defendants suggest that subjecting them individually to liability on a motion for summary judgment denies them their right to have a jury apportion fault between themselves and any relevant nonjoined parties for purposes of calculating damages. The Defendants have not shown that they have sought to join other parties or to apportion damages with other non-parties. Nevertheless, we do not see how summary judgment on liability deprives them of either their right to apportionment or to a jury trial. A determination of liability on a motion for summary judgment in no way precludes the apportionment of fault for damages. To the extent that some parties who are responsible for damages have not been joined, there is no reason to believe that the Defendants will be held accountable for damages caused by those parties. Additionally, if the Defendants can show that they are entitled to a jury trial on the issue of apportionment of damages, there is no reason that a summary judgment on the issue of liability would interfere with such a right