Gants, Ralph D., J.
The New England Patriots (“the Patriots”) have brought this action seeking, among other things, permanent injunctive relief barring de *479 fendant StubHub, Inc. (“StubHub”) from participating in the resale of Patriots tickets on its internet website.[3] As against StubHub, the Amended Complaint claims (1) intentional interference with advantageous relations (Count I); misappropriation of name (Count II); and unfair trade practices in violation of G.L.c. 93A, §11 (Count III).[4] In Count VII, the Patriots ask the Court to hold all StubHub profits obtained through the sale of Patriots’ tickets in a constructive trust. StubHub has moved for partial summary judgment on Count I. For the reasons detailed below, the motion is DENIED.
BACKGROUND
The following facts are undisputed unless otherwise noted. Each season, the Patriots make available tickets to home football games. Over 95% are season tickets issued by NEP; the balance are premium seating tickets issued by NPS. Until 2007, the following warning was printed on the back of each ticket in large block letters:
ANY NON-LICENSED INDIVIDUAL RESELLING THIS TICKET BY ANY METHOD INCLUDING WITHOUT LIMITATION, IN PERSON, ON AN AUCTION WEB SITE, OR OTHERWISE OVER THE INTERNET AND ANY LICENSED INDIVIDUAL OR ENTITY RESELLING THIS TICKET IN VIOLATION OF APPLICABLE LAW, IS SUBJECTTO ARREST, LEGAL ACTION AND LOSS OF SEASON TICKET PRIVILEGES.[5]
In addition, each ticket stated that it was a revocable license, that the Patriots reserved the right to revoke the ticket at any time and for any reason, and that the Patriots may refuse admission to, or eject, any ticket holder who fails to comply with any applicable rules or terms.
In an effort to maintain what the Patriots describe as a safe, secure, and family-friendly environment for home games, they have exercised their right to revoke season tickets when ticket holders, either the ticket owners themselves or their guests, have engaged in what the Patriots consider to be unsafe or unacceptable conduct. See Yarde Metals, Inc. v. New England Patriots, LP, 64 Mass.App.Ct. 656, 660 (2005). Thus, for example, should a season ticket holder give his or her tickets to another person for any single home game, and should the Patriots eject that person for unacceptable conduct, the Patriots may revoke the season tickets, regardless of the fact that the original holder was not present at the game. Upon learning that a ticket holder has impermis-sibly transferred a ticket or tickets, the Patriots have revoked that holder’s season tickets and refunded the full face value. In this way, all season ticket holders are responsible for the behavior of their guests. In order to effectuate this policy, each ticket bears a unique bar code that is electronically scanned upon entrance. Should the Patriots cancel a ticket, the bar code is voided, and the ticket is useless.
The Patriots are blessed with many loyal fans who wish to buy season tickets but are unable to do so. The Patriots have therefore established a wait list where, for a $100 deposit per seat, fans may join the list and await the opportunity to buy season tickets as they become available. The deposit is credited toward the purchase of season tickets when they do become available, and is refundable if no seats are available when the fan removes his or her name from the wait list.
The Patriots also recognize that season ticket holders may not be able to attend all the pre-season and home games. For this reason, the Patriots provide an online forum through TicketMaster, called TicketExchange, whereby holders may post their tickets on a secure website accessible only to other season ticket holders and wait list members.[6] Once a match is made on TicketExchange between the season ticket holder who has posted the seats, and the person seeking them, the Patriots cancel the original tickets, void the bar code, and issue to the recipient new tickets with a different and valid bar code. The Patriots sell the tickets at face value, and reimburse the original holder of the unused tickets. Since the tickets sold through TicketExchange are can-celled, not transferred, the original holder is not responsible for the behavior of persons sitting in those seats. Neither the selling ticket holder, the purchasing ticket holder, nor the Patriots profit in any way from any TicketExchange transaction.[7]
StubHub operates a website (www.stubhub.comj that allows people to buy and sell tickets to sporting, concert, theater, and other live entertainment events. In order to use the website, an individual must register as a StubHub member, and agree, among other things, to comply with “all applicable local, state, federal and international laws, statutes and regulations regarding the use of the Site and the selling of tickets.” On its seller “Q&A” page, StubHub states that Massachusetts law prohibits the reselling of tickets at more than $2.00 above face value, except that a licensed broker may charge additional expenses “related to acquiring and selling the ticket.” See G.L.c. 140, §§185A & D
Sellers list their available tickets on the website and assign a price to each ticket in one of three formats; (1) auction, where the seller lists a minimum price and an auction length, up to seven days, and buyers may bid accordingly; (2) fixed price, where the seller lists a definite price at which the ticket will sell immediately when the buyer clicks “Buy Now”; and (3) declining price, whereby the seller sets a maximum price which will decrease linearly each day until the seller’s minimum price has been reached. Pursuant to the user agreements, Stub-Hub receives a 25% commission from each sale: 15% of the selling price from the seller, and 10% added to the total sales price due from the buyer. It is undisputed that the majority of Patriots tickets sell on StubHub for prices greatly in excess of face value.
StubHub offers buyers its “FanProtect Guarantee” in the event that tickets are invalid, or are not honored by the venue. To invoke this Guarantee, the buyer must first obtain independent confirmation from the venue, in this case the Patriots, that the tickets are invalid. Upon receipt of this confirmation, StubHub will refund the full *480 purchase price to the buyer, including all service fees and handling charges. This guarantee is limited to two claims, or a lifetime maximum of $1,000.
In addition to the above services, in 2005 StubHub created a category of sellers it has identified as “LargeS-ellers.” As defined by StubHub, LargeSellers are those who “take a large interest in tickets spanning over multiple events and genres” for whom StubHub provides extended privileges and incentives above those provided to its regular users. The 2005 “LargeSeller’s Handbook” states that “StubHub strongly urges our LargeSellers to check the website from time to time for underpriced tickets or exclusive listings that may not be seen elsewhere.”[8] As an incentive to LargeSellers, StubHub offers “the additional benefit of purchasing tickets with no ‘buy-side’ fee. In other words, the standard fee of 10% that is added to the listing price at the END of the transaction is removed for LargeSellers.” LargeSeller’s Handbook, April 2005.[9]
Beginning in 2007, StubHub started allowing Large-Sellers to “mask” ticket locations by listing a different row, up to five rows away, than that printed on the original ticket. If the tickets offered are further than five rows from the original ones, or are in a different section, the LargeSeller must provide StubHub with the actual location and obtain approval before confirming the order. That exact location, however, is not passed on to the buyer until he or she receives the tickets.
According to the Patriots, starting in 2005 they noticed a larger number of patrons seeking admission through cancelled tickets; the majority of those fans reported that they had purchased those tickets through StubHub.[10] The Patriots assert that the increase in invalid tickets presented for admission required them to devote personnel to manage not only the confirmation that StubHub requires for a buyer to qualify for a refund, but also inquiries and complaints from fans who had driven some distance and paid for parking, only to be turned away at the gate. In a letter dated November 21, 2006, the Patriots requested that StubHub immediately stop facilitating the resale of Patriots tickets. When StubHub refused to comply, the Patriots initiated the instant action.
DISCUSSION
To prevail on summary judgment, the moving party must establish that there is no genuine issue of material fact on every element of a claim and that it is entitled to judgment on that claim as a matter of law. See generally Mass.RCiv.P. 56(c); Highlands Insurance Co. v. Aerovox, Inc., 424 Mass. 226, 232 (1997). Where the party opposing summary judgment has the burden of proof at trial, the moving party is entitled to summary judgment if it “demonstrates, by reference to material described in Mass.RCiv.P. 56(c), unmet by countervailing materials, that the party opposing the motion has no reasonable expectation of proving an essential element of that party’s case.” Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). ‘To be successful, a moving party need not submit affirmative evidence to negate one or more elements of the other party’s claim.” Id. It is sufficient to demonstrate that “proof of that element is unlikely to be forthcoming at trial.” Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991).
Phrased differently, summary judgment should be granted when, if the plaintiff were to prevail at trial on evidence identical to that in the summary judgment record, the court would be required to grant judgment notwithstanding the verdict, because, even when viewing the evidence in the light most favorable to the plaintiff, no reasonable jury could find in the plaintiffs favor based on that evidence. See generally Donaldson v. Farrakhan, 436 Mass. 94, 96 (2002) (“The standard applied to a motion for a directed verdict is identical to that applied to a motion for summary judgment . . .”); D’Annolfo v. Stoneham Housing Authority, 375 Mass. 650, 657 (1978) (“The standard to be used on a motion for judgment notwithstanding the verdict is the same as that on a motion for a directed verdict”); Cambridgeport Savings Bank v. Boersner, 413 Mass. 432, 438 (1992). In such cases, a trial would be a futile waste of judicial resources, because the ultimate result could not be altered by the jury’s verdict.
As noted earlier, the focus of this motion for partial summary judgment is on a single count, alleging intentional interference with advantageous relations. The tort of intentional interference with advantageous relations “protects a plaintiffs present and future economic interests from wrongful interference.” Blackstone v. Cashman, 448 Mass. 255, 259 (2007). The Patriots’Amended Complaint essentially incorporates into a single claim two related torts; tortious interference with contract and tortious interference with a prospective contractual relationship. In short, the Patriots allege both that StubH-ub has intentionally interfered with its existing contractual relationships with season ticket holders and with its prospective contractual relationships with those same season ticket holders and with wait list members. The melding of these torts into a single claim has little practical consequence, since the substantive elements are substantially similar and Massachusetts courts have not consistently distinguished between the two. Shafir v. Steele, 431 Mass. 365, 370 n.10 (2000); Cavicchi v. Koski, 67 Mass.App.Ct. 654, 657 (2006).
The Patriots’ tortious interference claim centers around the relationship they have with their fans, both season ticket holders and those on the wait list, and their commitment to maintain a safe and family friendly environment for home games. In a nutshell, the Patriots argue;
“The purchase of a ticket to a sports or entertainment event typically creates nothing more than a revocable license." Yarde Metals, Inc. v. New England Patriots Ltd. Partnership, 64 Mass.App.Ct. at 658. The Patriots have expressly declared that their tickets to home games are not transferable, and that anyone who *481 chooses to transfer them except through TicketE-xchange may have their season tickets revoked.
The Patriots’ commitment to nontransferability is intended to permit them to determine who is responsible for inappropriate behavior and hold the ticket holder responsible for such behavior, which allows them to maintain control over the entire venue. Since buyers on StubHub are likely one-time anonymous buyers, they do not have the same incentive to behave appropriately as do season ticket holders who know that their tickets may be revoked at any time.
In addition, when tickets are sold on StubHub, they are not offered on TicketExchange to other season ticket holders and wait list members, which interferes with the goodwill the Patriots have fostered with their most loyal fans.
To prevail on their tortious interference claim, the Patriots must prove that “(1) [they] had an advantageous relationship with a third party (e.g., a present or prospective contract or employment relationship); (2) [StubHub] knowingly induced a breaking of the relationship; (3) [StubHub’s] interference with the relationship, in addition to being intentional, was improper in motive or means; and (4) the [Patriots were] harmed by [StubHub’s] actions.” Blackstone v. Cashman, 448 Mass. at 260, citing Weber v. Community Teamwork, Inc., 434 Mass. 761, 781 (2001). Harm has been described as a loss of advantage or damage to an economic relationship that resulted directly from the defendant’s conduct. Kurker v. Hill, 44 Mass.App.Ct. 184, 191 (1998); Ratner v. Noble, 35 Mass.App.Ct. 137, 138 (1993). The harm must result in economic loss; where the plaintiff does not suffer any pecuniary loss as a result of the defendant’s actions, there can be no recovery on a tortious interference claim. Birbiglia v. Saint Vincent’s Hosp., Inc., 427 Mass. 80, 83 (1998); Ratner, 35 Mass.App.Ct. at 138 (essence of tort is damage to business relationship); Tech Plus, Inc. v. Artsel 59 Mass.App.Ct. 12, 18-19 (2003) (pecuniary loss is essential element of tort).
StubHub, for purposes of summary judgment, essentially concedes that there is a genuine issue of fact as to whether it knowingly induced season ticket holders to breach the terms of their license by transferring their Patriots tickets. It argues that it is entitled to summary judgment because there is no evidence in the summary judgment record that would allow the Patriots to prove any of the three other elements of a tortious interference claim. Specifically, StubHub contends that the Patriots have offered no evidence that (1) the Patriots have any expectation of financial benefit in their relationship with either season ticket holders or wait list members; (2) that StubHub’s alleged interference was improper in motive or means; or (3) that the Patriots suffered any pecuniary loss from the alleged tortious interference. This Court will address each of these arguments in turn.
1. Did the Patriots have an advantageous relationship with season ticket holders or wait list members?
StubHub first argues that the Patriots cannot satisfy the first element of their claimthat they had a financially advantageous relationship with their season ticket holders or wait list members. “It is well settled that an existing or even a probable future business relationship from which there is a reasonable expectancy of financial benefit is enough” to satisfy this element. Owen v. Williams, 322 Mass. 356, 361-62 (1948). The Patriots certainly have an existing relationship with their season ticket holders for each football season, and a probable future business relationship with both their season ticket holders (who are not contractually promised a right to renew but generally do so) and their wait list members (who join the wait list to become eligible for season tickets as they become available).
StubHub, however, contends that there is no “reasonable expectancy of financial benefit” from the Patriots’ relationship with existing season ticket holders because that reasonable expectancy is extinguished once the season ticket holders purchase their tickets. According to StubHub, even if the Patriots were to revoke the season ticket holder’s “license” for the season (because the ticket holder had sold tickets online through StubHub) and refund the face value of the remaining tickets, the Patriots still would suffer no economic loss because the remaining tickets would quickly be scooped up by wait list members at the face value price. See Yards Metals v. New England Patriots, 64 Mass.App.Ct. at 661 (“any resale of the tickets would only make the Patriots whole for the revenue [they] lost. . .’’). StubHub also contends that there is no “reasonable expectancy of financial benefit” from the Patriots’ relationship with wait list members because the Patriots admit that they receive no financial benefit from the ticket sales arranged through TicketExchange.
StubHub’s analysis of this first element of tortious interference is far too narrow and is conflated with the third elementthat the plaintiff suffer some financial harm from the third party’s interference with contract. It cannot reasonably be disputed that the Patriots have both an existing and a probable future business relationship with both season ticket holders and wait list memberswho are would-be season ticket holdersand that they have a reasonable expectancy of financial benefit from the ticket prices they would pay for these season tickets. This is enough to satisfy this first element. Massachusetts courts have repeatedly stated that a plaintiff may prevail on a tortious interference claim by proving either “a business relationship or contemplated contract of economic benefit . . .” Powers v. Leno, 24 Mass.App.Ct. 381, 384 (1987) (emphasis added). See also Blackstone, 448 Mass. at 259 (advantageous relationship is a present or prospective contract or employment relationship) (emphasis added); Owen, 322 Mass. at 361-62 (plaintiff needs to prove “an existing or even a *482 probable future business relationship from which there is a reasonable expectancy of financial benefit . . .” (emphasis added).
2. Was StubHub’s alleged interference improper in motive or means?
For purposes of this motion, StubHub concedes that it knowingly induced Patriot ticket holders to breach their revocable license with the Patriots by inviting them to transfer tickets that, under the terms of the license, were not transferable. StubHub correctly notes, however, that a claim of tortious interference requires more than proof of an intentional inducement of a breach; it requires proof that the inducement to breach was either done with improper motive or committed through improper means. See United Truck Leasing Corp. v. Geltman, 406 Mass. 811, 816 (1990); Kurker, 44 Mass.App.Ct. at 91, citing Draghetti v. Chmielewski, 416 Mass. 808, 816 n.11 (1994).
The Patriots rely heavily on various federal cases, beginning in 1907 with Bitterman v. Louisville & Nashville R.R., 207 U.S. 205, 213 (1907), in which federal courts held that discount ticket brokers who unlawfully resold tickets (train tickets in Bitterman and airline tickets in the later cases) that were not transferable committed tortious interference because they had induced the ticket holder to breach his contract with the railroad or the airline by transferring it. See, e.g., Transworld Airlines v. American Coupon Exch., 913 F.2d 676, 687 (9th Cir. 1990). The Patriots contend that these cases illustrate that aiding in the resale of non transferable tickets is sufficient, with nothing more, to support a claim of tortious interference. The Patriots correctly understand these cases but these cases do not accurately reflect the Massachusetts common law governing tortious interference.
In Bitterman, it is not precisely clear whether the Supreme Court is declaring federal common law or is concerned with enforcing the Interstate Commerce Act’s mandate for an equality of rates and a prohibition of preferences, but it is clear that the elements it declared for a tortious interference claim do not include the element required under Massachusetts law that the conduct be improper in motive or means. 207 U.S. at 221-23. The Supreme Court in Bitterman declared that tortious interference “is committed by one who ‘maliciously interferes in a contract between two parties and induces one of them to break that contract to the injury of the other.’ ” Id. at 222-23, quoting Angle v. Chicago, St. Paul & C. Ry. Co., 151 U.S. 1 (1894). It then added, “The wanton disregard of the rights of a carrier causing injury to it, which the business of purchasing and selling non-transferable reduced rate tickets of necessity involved, constitute legal malice.” Bitterman at 223. In short, the United States Supreme Court declared that intentionally inducing a breach of contract is sufficient alone to establish malice; Massachusetts law requires more than inducement, and does not consider inducement alone to satisfy the separate element of improper motive or means. Similarly, in Trans world Airlines, the Ninth Circuit applied California law governing the cause of action for tortious interference with business relations, which does not include the element of improper motive or means. 913 F.2d at 689.[11]
Here, the Patriots’ tortious interference claim alleges improper means, perhaps recognizing that StubHub’s motive to make money and benefit its customers does not constitute an improper motive under the law. See United Truck Leasing Corp., 406 Mass. at 817; King v. Driscoll, 418 Mass. 576, 587 (1994). Improper means must consist of conduct that violates a statute or constitutes a common-law tort. Kurker, 44 Mass.App.Ct. at 191-92; Cavicchi v. Koski, 67 Mass.App.Ct. at 658 (“Improper means include violation of a statute or common-law precept, e.g., by means of threats, misrepresentation, or defamation”). The issue, then, is whether the Patriots have presented evidence of improper means.
The Patriots essentially argue that StubHub is engaged in three types of illegal conduct: common-law misrepresentation, trespass, and contributing to violation of the “anti-scalping” lawsG.L.c. 140, §185A & 185D. As to common-law misrepresentation, the Patriots argue that StubHub affirmatively sought to prevent the Patriots from learning which of its season ticket holders were selling tickets online with StubHub by allowing LargeSellers to “mask” ticket locations by listing a different row, up to five rows away, than that printed on the original ticket and by not informing the buyer of the exact location of the tickets until the buyer receives them. This Court, however, can find nothing in the record to support the contention that StubHub was misrepresenting the location of the tickets to the buyer of the tickets. As far as this Court can discern from this record, the buyer is told that he is buying a ticket within five rows of the identified location rather the precise seat identified. Nor does the record reflect that StubHub has induced or encouraged their ticket buyers to make affirmative misrepresentations to the Patriots when they present their tickets to enter Gillette Stadium.[12] The Patriots, therefore, are really arguing that StubHub engages in improper means by making it harder for the Patriots to detect who among its season ticket holders are selling tickets online through StubHub. This Court does not believe that this alone is sufficient to constitute the required improper means. Rather, minimizing the risk of detection is simply part of StubHub’s inducement to commit the breach itself.
Alternatively, the Patriots argue that StubHub engaged in a misrepresentation of omission by failing to inform its customers that the Patriots intended to enforce the prohibition against transfer declared on their tickets. This Court recognizes that it is an unfair act or practice in trade and commerce to fail to disclose to a prospective buyer a known material fact that may have caused the prospective buyer not to enter into the transaction. See Underwood v. Risman, 414 Mass. 96, 99 (1993); 940 C.M.R. §3.16(2). This fact, however, was *483 already known to the Patriots ticket holder, since the warning was contained both on the back of the ticket and in the Fan Guide provided to each season ticket holder with their tickets each year. This fact may not have been known by the prospective ticket buyer on StubHub, but StubHub’s FanProtect Guarantee protects these buyers from the invalidation of tickets they purchase by assuring them a full refund if the Patriots confirm that the tickets are invalid. Moreover, shortly after this lawsuit was first filed, StubHub placed on the “Notifications” page of its website a section devoted to this lawsuit that makes clear that the Patriots are challenging the rights of individuals to resell their Patriots tickets on StubHub. Consequently, even viewing the evidence in the light most favorable to the Patriots, the evidence does not support a finding that StubHub engaged in the improper means of misrepresentation, either under the common law or under G.L.c. 93A.
The Patriots also allege that a non-season ticket holder commits a trespass when he uses a transferred ticket to enter Gillette Stadium to watch a Patriots game, and that StubHub facilitates such a trespass. This argument may have been persuasive if the Patriots, like an airline, had placed a name on a ticket and permitted only that person, verified by photographic identification, to enter the stadium with that ticket, but they did not. The Patriots’ counsel candidly admitted that, if a season ticket holder gives or sells a ticket to a family member, friend, or business associate, the Patriots would not consider that transfer to justify a loss of season ticket privileges. Consequently, the Patriots do not deem transfer alone to warrant revocation of their revocable season ticket “license”; it is only transfer by sale to strangers that warrants revocation. Since it does not consider all those with transferred tickets to be trespassers, it cannot prevail in proving that anyone with a transferred ticket should be deemed a trespasser.
As to the “anti-scalping laws,” G.L.c. 140, §185A provides that “[n]o person shall engage in the business of reselling any ticket or tickets of admission ... to any theatrical exhibition, public show or public amusement or exhibition . . . without being licensed therefor by the Commissioner of Public Safety...” The precise meaning of “engag[ing] in the business of reselling any ticket or tickets” has yet to be articulated by our appellate courts. The Supreme Judicial Court declared in 1929 “that the offence denounced by §185A ... is engaging in the business ‘of reselling’ tickets; and it is the occupation and not an isolated act which is forbidden.” Commonwealth v. Sourensky, 269 Mass. 460, 462 (1929). In Sourensky, the Court noted that “one may be engaged in the business of selling although he has made no sale,” and added that “[a] single sale taken with other circumstances may be enough to make out the offense of doing business.” Id. at 462-63. Yet, this assertion should not suggest that a single sale alone, without other circumstances suggesting that the person is in the business of reselling tickets, is sufficient to constitute a violation of §185A. Sovrensky’s conviction for violating G.L.c. 140, §185A was affirmed, but he was observed in front of the old Boston Garden prior to a wrestling match calling out that he had tickets for sale, and he had sold two tickets for three times the face value price and had two more on his person when he was arrested. IcL at 462. It appears that, to be engaged in the business of reselling, one must, at the very least, wish to sell more than one ticket for a profit, but it is not clear how many sales or prospective sales are needed to become so engaged. See Lanier v. City of Boston, 95 F.Sup.2d 17, 19 (D.Mass. 2000) (sale outside Fenway Park of single ticket at face value is not engaging in the business of reselling).
Even licensed ticket brokers engaged in the business of reselling tickets are limited in the price they may chargethe price of a resold ticket may not exceed the price printed on the face of the ticket, plus $2, plus service charges. G.L.c. 140, 185D. The service charges may not include the purchase price of the ticket above face value, since that “would add as an allowable cost one which emasculates the basic provision limiting the price to be charged.” Commonwealth v. Santangelo, 25 Mass.App.Ct. 583, 584 (1988). Consequently, if a ticket reseller purchases a $30 ticket for $80, he may not charge more than $30, plus $2, plus service charges, and may not include the $50 paid above face value as a service charge. See id.
This Court need not determine on summary judgment how many StubHub sellers of Patriots tickets are engaged in the business of reselling tickets, since the evidence is clear that some sellers (and buyers) are engaged in that business. As noted earlier, StubHub has a category of sellers it identifies as “LargeSellers” which it defines as those who “take a large interest in tickets spanning over multiple events and genres.” StubHub’s definition of LargeSellers may not match precisely the definition under Massachusetts law of those engaged in the business of reselling tickets under §185A, but it is close enough to suggest that most, perhaps all, LargeSellers are so engaged.
There is abundant evidence in the record that the resale prices of Patriots tickets on StubHub generally far exceed the price threshold permitted under §185D. StubHub correctly observes that it does not sell tickets itself, but simply provides an online forum for others to sell tickets. That alone, however, is not enough to establish that it does not engage in improper means. The Patriots may prove that StubHub induced a breach of contract by improper means if they can show that StubHub intentionally induced or encouraged others to violate §§185A or 185D, or profited from such violations while declining to stop or limit it. See Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd., 545 U.S. 913, 930 (2005) (“Grokstef’) (applying this standard to claim of copyright infringement against software company that facilitated download of copyrighted music and video).
*484 Grokster distributed free software products that allowed users to share electronic files through peer-to-peer networks, where users’ computers communicated directly with each other, bypassing central servers. Id. at 919-20. Recipients used the defendants’ software primarily to share and download copyrighted music and video files without authorization. Id. at 920. MGM sued the defendants for “their users’ copyright infringement, alleging that they knowingly and intentionally distributed their software to enable users to reproduce and distribute copyrighted works in violation of the Copyright Act, 17 U.S.C. §101 et seq. (2000 ed. and Supp. II).” Id. at 920-21. Although the defendant companies did not profit directly from the distribution of the software, they generated income by selling advertising space, and streaming the advertisements to software users while they employed the programs. Id. at 926.
The Court noted that, where a “widely shared service or product is used to commit infringement, it may be impossible to enforce rights in the protected work effectively against all direct infringers, [thus] the only practical alternative being to go against the distributor of the copying device for secondary liability on a theory of contributory or vicarious infringement . . . One infringes contributorily by intentionally inducing or encouraging direct infringement. . . and infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it. . .” Id. at 929-30 (internal citations omitted). Active steps “designed to encourage infringement include advertising, instructing how to engage in infringement, showing an affirmative intent that the product be used in that manner ...” Id. at 935. The Court held that “one who distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties.” Id. at 918. See also A&M Records, Inc. v. Napster, Inc., 239 F.3d 1004 (9th Cir. 2001) (defendant secondarily liable for copyright infringement where it knew third parties were infringing, materially contributed to that activity, had a direct financial interest in the acüviiy, and failed to terminate the infringement).
StubHub contends that it is protected against any allegation that it knowingly participated in any violation of the “anti-scalping” laws because it requires each user to agree to a user agreement that provides in part:
You agree not to use this Site for unlawful purposes or in an unlawful manner. You agree to comply with all applicable local, state, federal and international laws, statutes and regulations regarding use of the Site and the selling of tickets . . .
You warrant that you will comply with all applicable local, state, federal and international laws, statutes and regulations regarding use of the Site and selling value of the tickets.
Moreover, on its seller question and answer page, the StubHub website asks, “How do I set prices for my tickets?,” and provides the answer:
When setting the sale price of your tickets, it is your responsibility to comply with all applicable local, state, federal and international laws, statutes and regulations . . .
To assist you with listing and pricing your tickets, the U.S. States and Canadian provinces with ticket resale regulations are listed below.
Below that message, next to “Massachusetts,” is a summary of G.L.c. 140, §185A and §185D.
The Patriots, however, in seeking to prove that Stub-Hub knowingly aided the commission of illegal conduct, is not limited to what StubHub said; it may also focus carefully on what it did. Here, StubHub’s pricing structure certainly meant that it profited from any violation of the “anti-scalping” laws, since its revenue increased in direct proportion to the price of the ticket sold. Moreover, StubHub’s website does not require the seller (or even ask the seller) the face value of the ticket, so there is no way for it or the buyer to know whether the sales price is above the price threshold set under § 185D. The absence of such information permits illegal ticket scalping to occur through the StubHub website and prevents any policing of the website to prohibit such scalping. StubHub’s apparent affirmative choice not to know the face value of the tickets does not mean that it did not contribute to illegal scalping; willful blindness is certainly not a defense to this crime. Finally, StubHub until 2008 affirmatively encouraged LargeSellers in the LargeSeller’s Handbook to “check the website from time to time for underpriced tickets or exclusive listings that may not be seen elsewhere,” and still encourages Large-Sellers to buy these underpriced tickets by waiving for them the fee due from all other ticket buyers 10 percent of the sales price. A factfinder reasonably may conclude that the so-called “underpriced” tickets are tickets priced within the legal limit set by §185D, and that StubHub, by encouraging LargeSellers to buy these tickets, is essentially encouraging LargeSellers to resell these tickets at higher prices, from which StubHub will enjoy a higher commission. Therefore, this Court finds that there is a genuine issue of material fact as to whether StubHub is intentionally inducing or encouraging others to violate §§185A or 185D, or profiting from such violations while declining to stop or limit them.
StubHub argues that it should be treated no differently from the newspaper “want-ads,” where a seller of any property, including football tickets, invites others to purchase the property, often at a set price. There are, however, at least two fundamental differences between StubHub’s website and the “want-ads” in the classified pages of a newspaper or comparable website. First, the newspaper generally charges a fixed price for the advertisement; its price is not dependent on the amount of the sale. See Chicago Lawyers’ Comm. for Civil Rights Under Law, Inc. v. Craigslist, 519 F.3d 666, 671-72 (7th Cir. *485 2008). Second, newspapers do not affirmatively seek to increase the price charged in the classified ad, especially when doing so may constitute a violation of law. In Craigslist, the Seventh Circuit, rejecting a claim that craigslist helped to violate the anti-discrimination laws in the Fair Housing Act, noted that nothing in the service provided by Craigslist encouraged those posting listings for rental or sale properties to add discriminatory preferences in violation of the Act. Id. at 671. “For example, craigslist does not offer a lower price to people who include discriminatory statements in their postings." Id. at 671-72. Compare with Fair Hous. Council of San Francisco Valley v. Roommates, LLC., 521 F.3d 1157, 1172 (9th Cir. 2008) (internet website designed to match people with spare rooms with people looking for a place to live does not merely provide a forum within which users may violate the Fair Housing Act, but actively elicits the discriminatory, illegal content of postings, and is thus “directly involved with developing and enforcing a system that subjects subscribers to allegedly discriminatory housing practices”).
StubHub contends that it is entitled to immunity pursuant to 47 U.S.C. §230(c)(l) of the Communications Decency Act of 1996 (the “CDA”). The purpose of the CDA was to “promote the free exchange of information and ideas over the Internet and to encourage voluntary monitoring for offensive or obscene material.” Carafano v. Metrosplash.com., Inc., 339 F.3d 1119, 1122 (9th Cir. 2003). It provides immunity to those providers of interactive computer services that publish content provided primarily by third parties. Id. at 1123. See Doe v. MySpace, Inc., 528 F.3d 1119, 1123 (9th Cir. 2003) (broad immunity under §230 extends to “all claims stemming from [an interactive service provider’s] publication of information created by third parties”). This Court recognizes that StubHub is an interactive computer service, that sellers who post their tickets on StubHub are information content providers within the meaning of §230, and that StubHub does not lose the immunity provided by the CDA if it simply knew that its sellers were potentially in violation of G.L.c. 140, §185A or §185D. See Universal Communications Sys., Inc. v. Lycos, 478 F.3d 413, 420 (1st Cir. 2007) (“Section 230 immunity applies even after notice of the potentially unlawful nature of the third-party content”).
However, CDA immunity “applies only if the interactive computer service provider is not also an ‘information content provider,’ which is defined as someone who is ‘responsible, in whole or in part,’ for the creation or development of the offending content.” Roommates, 521 F.3d at 1162; 47 U.S.C. §230(f)(3). The Ninth Circuit has interpreted the term “development” as “referring not merely to augmenting the content generally, but to materially contributing to its alleged unlawfulness. In other words, a website helps to develop unlawful content, and thus falls within the exception to section 230, if it contributes materially to the alleged illegality of the conduct.” Roommates, 521 F.3d at 1167-68. Here, as discussed earlier, there is evidence in the record that StubHub materially contributed to the illegal “ticket scalping” of its sellers. In effect, the same evidence of knowing participation in illegal “ticket scalping” that is sufficient, if proven, to establish improper means is also sufficient to place StubHub outside the immunity provided by the CDA.
3. Did the Patriots suffer any pecuniary loss as a result of StubHub’s alleged tortious interference?
StubHub argues that the Patriots cannot show any pecuniary loss and that, even if they could do so, any financial loss would not be a result of StubHub’s actions. The gist of StubHub’s argument in this regard is that the Patriots receive payment from season ticket holders regardless of any alleged interference, since the tickets are bought before they are listed on the website and, in any event, any revocation of season tickets cannot result in pecuniary loss where those tickets may be sold immediately to wait list members.
The Patriots allege two types of pecuniary loss: the loss of goodwill arising from damage to their relationship with their season ticket holders and wait list members, and direct costs arising from the sale of invalid tickets through StubHub. The alleged loss of goodwill arises from the Patriots’ commitment to provide a safe and family-friendly environment for home football games. The Patriots contend that, since those who purchase Patriots tickets on StubHub are likely one-time anonymous buyers, and do not have the same incentive to behave appropriately as do those season ticket holders who know that their tickets may be revoked at any time for bad behavior, StubHub interferes with the goodwill the Patriots have built with their fans by creating a civil venue to watch a football game. The Patriots also assert that StubHub interferes with the goodwill they have fostered with their fans by allowing tickets to be sold on StubHub rather than be offered on TicketExchange to other season ticket holders and wait list members. This diminishes the availability of Patriots tickets on TicketExchange, and thereby diminishes one of the benefits of being a season ticket holder or wait list member.
The alleged direct costs are sustained because (1) Patriots staff at ticket windows must respond to inquiries and complaints from those fans who, having purchased invalid tickets through StubHub, are then turned away at the gate and ask for the written confirmation needed to obtain a refund of the ticket price through StubHub, (2) Patriots staff must investigate ticket resale and revoke season tickets from holders who have been encouraged by StubHub to sell their tickets on its website, and (3) the increased likelihood of improper conduct by anonymous StubH-ub buyers necessitates increased security measures.
The element of economic loss required to establish tortious interference cannot be established by “speculative or conjectural losses.” Chemawa Country Golf, Inc. v. Wnuk, 9 Mass.App.Ct. 506, 510 (1980). It is not *486 enough that the conduct was “intensely irritating." Id. at 511. “Chemawa is a corporation which has no heart to ache or ulcer to bleed and, in any event, it is not vexation but interference with beneficial relations with third parties which must be established.” Id. Without more, it is not enough that the Patriots allege damage to the somewhat vague and not easily quantifiable concept of “goodwill” that they claim they assiduously cultivated with their fans. There is no evidence that fans who obtained their tickets from StubHub were more unruly than other fans, or that instances of unruly conduct have increased as a result of StubHub’s ticket sales. Nor is there any evidence that more individuals would seek to be season ticket holders if more tickets were made available through TicketExchange rather than StubHub. Nor is there any evidence that any such increased interest in season tickets would have any financial impact on the Patriots, who already have awaiting list of at least 19,000 fans. Noris there any expert testimony that, if the team were placed on the market to be sold, the fair market value of the team’s goodwill would be greater if StubHub stopped selling Patriots’ tickets. In short, other than the Patriots’ assertions of damage in this regard, the record before the Court provides no evidence of any actual pecuniary loss or financial harm as a result of StubHub’s alleged interference with “goodwill” or any diminution in the Patriots’ ability to provide a family-iriendly environment. See Lalonde v. Eissner, 405 Mass. 207, 209 (1999) (opposing party cannot rest on pleadings and mere assertions of disputed facts to defeat the motion for summary judgment).
A far closer call, however, is whether the Patriots incur increased administrative costs as a result of the sale of invalid tickets through StubHub. There is evidence, albeit scant, that the Patriots’ personnel at ticket windows must deal with complaints and inquiries from fans with tickets purchased through StubHub who are turned away at the gate, and must provide them with the confirmation necessary for StubHub to refund the ticket price. There is also evidence, again scant, that the sale of Patriots’ tickets through StubHub increases the cost to the Patriots of investigating and addressing ticket resale activity. While it is not dear from the record before the Court whether, as a result of these additional administrative burdens, the Patriots must hire additional personnel, add to the hours worked by existing personnel, divert current staff from other duties, or pay the same employees more to perform additional work, this Court is satisfied that, viewing the evidence in the light most favorable to the Patriots, there is a genuine issue of material fact as to whether the Patriots have incurred or will incur additional administrative costs as a result of StubHub’s conduct. These administrative costs are, at best, a toehold to establish pecuniary loss, but a toehold is sufficient to survive a motion for summary judgment. Marr Equipment Corp. v. I.T.O. Corp., 14 Mass.App.Ct. 231, 235 (1982).
ORDER
For the reasons stated above, this Court ORDERS that StubHub’s motion for partial summary judgment on Count I, alleging intentional interference with advantageous relations, is DENIED.

The action is formally brought by two plaintiffs: NPS LLC (“NPS’j, the owner of Gillette Stadium and the issuer of premium seating tickets to the Patriots football games, and the New England Patriots, LP (“NEP”), the issuer of season tickets to those games. For simplicity’s sake, this Court collectively shall refer to both entities as the Patriots.

The Patriots have also filed a motion for leave to file an amended complaint to include as against StubHub claims of (1) civil conspiracy: (2) trespass: and (3) unjust enrichment, and to add as a defendant Last Minute Transactions, a wholly owned subsidiary of StubHub.

The Patriots revised this language for the 2007 NFL season to read: ‘This ticket is a non-transferable revocable license . . . ANY PERSON NOT LICENSED PURSUANT TO M.G.L.c. 140, §185A RESELLING THIS TICKET BY ANY METHOD INCLUDING WITHOUT LIMITATION IN PERSON, ON AN AUCTION WEB SITE, OR OTHERWISE OVER THE INTERNET, AND ANY PERSON OR ENTITY SO LICENSED RESELLING THIS TICKET ON AN AUCTION WEB SITE OR IN VIOLATION OF APPLICABLE LAW, IS SUBJECT TO ARREST, LEGAL ACTION AND LOSS OF SEASON TICKET PRIVILEGES.”

Through TicketExchange, the Patriots also sell the remaining games from season tickets that had been revoked.

Only TicketMaster profits from TicketExchange through the fee it charges for use of its ticket exchange service.

In the 2006 handbook, the language was changed to “StubHub suggests . . .” The 2008 handbook omits the sentence entirely.

The wording of the relevant section in the January 2008 handbook is slightly different, although not materially so.

Presumably this occurs in large part when a season ticket holder, whose tickets have been cancelled for any reason, then decides to sell them on StubHub in the expectation of making a profit, rather than obtaining a refund for face value from the Patriots. Because the Patriots void the bar code on any cancelled tickets, those tickets subsequently sold on StubHub are not honored at the gate.

 :The elements in the California cause of action are:
(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant’s knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant.
Id., citing Youst v. Longo, 43 Cal.3d 64, 71 n.6, 233 Cal.Rptr. 294, 298 n.6, 729 P.2d 728, 733 n.6 (1987).

Compare with American Airlines, Inc. v. Christensen, 967 F.2d. 410 (10th Cir. 1992) (improper conduct where defendant ticket broker altered airline tickets, manufactured phony identification cards, and instructed the buyers to lie to airline ticket agents); American Airlines, Inc. v. Platinum World Travel, 769 F.Sup. 1203, 1206-07 (D.Utah 1990) (improper conduct where defendant ticket broker “developed an elaborate system of deception,” including booking false reservations and providing tickets in different name from user); Northwest Airlines, Inc. v. The Ticket Exch., 793 F.Sup. 976, 979 (W.D.Wash. 1992) (improper conduct where defendant instructed purchasers of non-transferable frequent flyer certificates to say tickets were gifts).